**THE ROSEN LAW FIRM, P.A.**
Laurence M. Rosen, Esq.,
Fla. Bar No. 0182877
275 Madison Avenue, 40th Floor
New York, New York 10016
Telephone: (212) 686-1060
Fax: (212) 202-3827
Email: lrosen@rosenlegal.com

*Counsel for Plaintiff*

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

| | |
|---|---|
| JOSEPH PIGNATELLI, Individually and on behalf of all others similarly situated,<br><br>     Plaintiff,<br><br>     v.<br><br>MSP RECOVERY, INC. F/K/A LIONHEART ACQUISITION CORP. II, JOHN H. RUIZ, CALVIN HAMSTRA, RICARDO RIVERA, OPHIR STERNBERG, JAMES ANDERSON, THOMAS BYRNE, THOMAS HAWKINS, ROGER MELTZER, ALEXANDRA PLASENCIA, FRANK C. QUESADA, BEATRIZ ASSAPIMONWAIT, and MICHAEL F. ARRIGO,<br><br>     Defendants. | **Case No:**<br><br>**CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Joseph Pignatelli ("Plaintiff"), individually and on behalf of all other persons similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants (defined below), alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, among other things, the investigation conducted by and through his attorneys, which included, among other things, a review of the Defendants' public documents, public filings, wire and

1

press releases published by and regarding MSP Recovery, Inc. f/k/a Lionheart Acquisition Corp. II. ("MSP Recovery" or the "Company"), and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a class action on behalf of persons or entities other than Defendants (defined below) who (1) purchased or otherwise acquired publicly traded MSP Recovery f/k/a Lionheart Acquisition Corp. II ("Lionheart") securities between April 28, 2022 and August 17, 2023, inclusive (the "Class Period"), seeking to recover compensable damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder; (2) all persons or entities who held Lionheart common stock eligible to vote at Lionheart's May 18, 2022 special meeting, seeking to pursue remedies under Section 14(a) of the Exchange Act; and (3) all persons who purchased or otherwise acquired MSP Recovery securities pursuant and/or traceable to the Company's registration statement filed with the SEC on July 1, 2022, as amended on July 21, 2022 and declared effective on August 5, 2022 (the "Registration Statement"), seeking to pursue remedies under Sections 11 and 15 of the Securities Act of 1933 (the "Securities Act").

## JURISDICTION AND VENUE

2.      The claims asserted herein arise under and pursuant to Sections 11 and 15 of the Securities Act, 15 U.S.C. §§ 77K and 77o, Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5), and Section 14(a) of the Exchange Act (15 U.S.C. § 78n(a) and Rule 14a-9 promulgated thereunder (17 C.F.R. § 240.14a-9).

3.      This Court has jurisdiction over the subject matter of this action pursuant to 28 28 U.S.C. § 1331, as well as Section 22 of the Securities Act and Section 27 of the Exchange Act (15 U.S.C. §78aa).

2

4. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)) as the alleged misstatements entered and the subsequent damages took place in this judicial district.

5. In connection with the acts, conduct and other wrongs alleged in this complaint, Defendants (defined below), directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications and the facilities of the national securities exchange.

**PARTIES**

6. Plaintiff, as set forth in the accompanying certification, incorporated by reference herein, purchased MSP Recovery securities during the Class Period and was economically damaged thereby.

7. Defendant MSP Recovery commonly does business under the name "LifeWallet" and describes itself as a "leading data analytics company specializing in healthcare Claims recovery. Our Assignors are healthcare providers and payers (the "Assignors") that have irrevocably assigned to us their recovery rights associated with certain healthcare Claims. We obtain Claims data from the Assignors and leverage our data analytics capabilities using our Claims recovery platform to identify payments that were improperly paid by our Assignors. We then seek the full recoverable amount from those parties who, under applicable law or contract, were responsible for payment (or reimbursement). [. . .]"

8. MSP Recovery is incorporated in Delaware and its head office is located at 2710 Le Jeune Road, Floor 10, Coral Gables, Florida 33134. MSP Recovery's common stock trades on the NASDAQ exchange ("Nasdaq") under the ticker symbol "LIFW".

9.     Defendant John H. Ruiz ("Ruiz") has served as the Company's Chief Executive Officer ("CEO") since it went public through a merger with Lionheart Acquisition Corp. II, a special purpose acquisition company, or "SPAC".

10.    Defendant Calvin Hamstra was the Company's Chief Financial Officer ("CFO") from June 24, 2022 until his resignation on June 28, 2023.

11.    Defendant Ricardo Rivera ("Rivera") has served as the Company's Interim CFO since June 29, 2023 and was previously the Company's Chief Operating Officer ("COO").

12.    Defendants Ruiz, Hamstra, Rivera are referred to herein as the "10(b) Defendants" or the "Individual Defendants".

13.    Each of the Individual Defendants:

(a)     directly participated in the management of the Company;

(b)     was directly involved in the day-to-day operations of the Company at the highest levels;

(c)     was privy to confidential proprietary information concerning the Company and its business and operations;

(d)     was directly or indirectly involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein;

(e)     was directly or indirectly involved in the oversight or implementation of the Company's internal controls;

(f)     was aware of or recklessly disregarded the fact that the false and misleading statements were being issued concerning the Company; and/or

(g)    approved or ratified these statements in violation of the federal securities laws.

14.    MSP Recovery is liable for the acts of the Individual Defendants and its employees under the doctrine of *respondeat superior* and common law principles of agency because all of the wrongful acts complained of herein were carried out within the scope of their employment.

15.    The scienter of the Individual Defendants and other employees and agents of the Company is similarly imputed to MSP Recovery under *respondeat superior* and agency principles.

16.    Defendant Ophir Sternberg ("Sternberg") was the Chief Executive Officer, President, and Chairman of the Board of Directors of Lionheart at the time of the Proxy statement.

17.    Defendant James Anderson ("Anderson") was a Lionheart Director at the time of the Proxy statement.

18.    Defendant Thomas Byrne ("Byrne") was a Lionheart Director at the time of the Proxy statement.

19.    Defendant Thomas Hawkins ("Hawkins") was a Lionheart Director at the time of the Proxy statement.

20.    Defendant Roger Meltzer ("Meltzer") was a Lionheart Director at the time of the Proxy Statement.

21.    Defendants Sternberg, Anderson, Byrne, Hawkins, and Meltzer (collectively, the "Director Defendants"), participated in Board meetings and conference calls, voted to approve the merger, signed and/or authorized the signing of the Proxy, approved the Proxy, solicited

approval of the merger through the Board's recommendation that Lionheart shareholders vote in favor the merger with MSP Recovery, which appeared in the Proxy, and permitted the use of their names in connection with the solicitation of proxies from the shareholders. In their capacities as signatories of documents set forth below, as well as by virtue of their authority to approve the merger, the Director Defendants possessed the power and authority to control the contents of the Proxy, as well as Lionheart's and the Company's press releases, investor and media presentations, and other SEC filings.

22.     The Registration Statement was signed by John H. Ruiz, Calvin Hamstra, Ricardo Rivera, Frank C. Quesada, Alexandra Plasencia, Ophir Sternberg, Roger Meltzer, Beatriz Assapimonwait, Michael F. Arrigo, and Thomas Hawkins (collectively, the "Section 11 Defendants").

23.     Defendant Ruiz signed the Registration Statement in his capacity as the Company's CEO and as a Company Director.

24.     Defendant Hamstra signed the Registration Statement in his capacity as the Company's CFO.

25.     Defendant Rivera signed the Registration Statement in his capacity as the Company's Chief Operating Officer

26.     Defendant Frank C. Quesada ("Quesada") signed the Registration Statement in his capacity as the Company's Chief Legal Officer and as a Company Director.

27.     Defendant Alexandra Plasencia ("Plasencia") signed the Registration Statement in her capacity as the Company's General Counsel.

28.     Defendant Sternberg signed the Registration Statement in his capacity as Company Director.

29.     Defendant Meltzer signed the Registration Statement in his capacity as a Company Director.

30.     Defendant Beatriz Assapimonwait ("Assapimonwait") signed the Registration Statement in her capacity as a Company Director.

31.     Defendant Michael F. Arrigo ("Arrigo") signed the Registration Statement in her capacity as a Company Director.

32.     Defendant Hawkins signed the Registration Statement in his capacity as a Company Director.

33.     The Company, the 10(b) Defendants, the Section 11 Defendants, and the Director Defendants are referred to, herein, collectively, as the "Defendants".

## SUBSTANTIVE ALLEGATIONS
### Materially False and Misleading
### Statements Issued During the Class Period

34.     On May 3, 2022, Lionheart Acquisition Corp. II filed with the SEC its definitive proxy on Form 424B3 (the "Proxy") to solicit votes for its May 18, 2022 Special Meeting to approve the planned merger with the then-private MSP Recovery, Inc. ("Legacy MSP"), whereby Legacy MSP would become a publicly-traded entity through its merger with Lionheart.

35.     The Proxy materially understated the substantial risks of merging with Legacy MSP, which is apparent from the dramatic decline of the post-merger MSP Recovery's stock price.

36.     The Proxy contained the following risk disclosure on the uncertainties of Legacy MSP's business model:

> *We have a history of net losses and no substantial revenue to date, and we may not achieve recoveries, generate significant revenue or achieve profitability. Our relatively limited operating history makes it difficult to evaluate our current business and future prospects and increases the risk of your investment.*

Our relatively limited operating history makes it difficult to evaluate our current business and plan for our future growth. MSP Recovery started in 2014 with its very first assignment from a health plan in Miami, Florida. To date we have achieved no substantial revenue and limited actual recoveries from our assigned claims, and there is no guarantee that we will achieve recoveries, revenue and profitability as we have projected. We have encountered and will continue to encounter significant risks and uncertainties frequently experienced by new and growing companies in rapidly changing industries, such as determining appropriate investments for our limited resources, competition from other data analytics companies, acquiring and retaining Assignors, hiring, integrating, training and retaining skilled personnel, unforeseen expenses, challenges in forecasting accuracy and successfully integrating new strategies. If we are unable to achieve actual recoveries, increase our Assignor base, successfully manage our recovery efforts from third-party payers or successfully expand, our revenue and our ability to achieve and sustain profitability would be impaired. If our assumptions regarding these and other similar risks and uncertainties, which we use to plan our business, are incorrect or change as we gain more experience operating our business or due to changes in our industry, or if we do not address these challenges successfully, our operating and financial results could differ materially from our expectations and our business could suffer.

37.     This statement was materially false and misleading because, at the time it was made, the Company was engaging in underhand business tactics with Cano Health, Inc. ("Cano Health"), which for a time sold Legacy and then post-Merger MSP health care claims to try and recover on. Specifically at issue is that Legacy and now-post Merger MSP has allegedly not paid Cano Health for the claims that Cano Health assigned to it, leading to Cano Health suing the Company.

38.     The Proxy contained the following statement about risk of failure to recover on the assigned claims.

*Under most of our agreements with Assignors, we assume the risk of failure to recover on the assigned claims, and if we fail to make recoveries with respect to the assigned claims receivables and therefore, are unable to generate recovery proceeds greater than or equal to the amounts paid by us to purchase the assigned claims, it can adversely affect our business.*

In many instances, we pay our Assignors an upfront purchase price for assignment of their healthcare claims recoveries. Accordingly, there is a risk that we may not successfully recapture the upfront purchase price if we fail to make recoveries with respect to the assigned claims. If we fail to generate significant recovery proceeds with

respect to the assigned claims, it would have an adverse effect on our profitability and business.

39.     This statement was materially false and misleading because in addition to bearing the risk of not winning in a litigation on a claim sold to the Company by the assignor (with Cano Health being a major assignor that the pre and post-Merger Company depended on), it was also exposed to significant litigation risk as a result of its failure to pay its assignors.

40.     The Proxy contained the following risk disclosure on the validity of its assignments:

> ***Our assignments can be deemed invalid in court which could adversely affect our recoveries and our business.***
> We typically receive assignments of healthcare claims recoveries from our Assignors via irrevocable assignments. Accordingly, we are able to pursue those claims that our Assignors originally owned. Enforceability of our assignment agreements are often challenged by defendants in court. If a court determines that an assignment agreement is invalid (whether due to a technical deficiency or regulatory prohibition or otherwise), we will lose the ability to pursue those claims. This can adversely affect our recovery efforts and our business.

41.     This statement was materially false and misleading because it did not disclose that there may be a heightened risk of an assignment being deemed invalid as a result of MSP Recovery's failure to properly pay assignors.

42.     The Proxy contained the following risk disclosure of assignors choosing to pursue recovery on claims directly, or turning to MSP Recovery's competitors.

> ***Assignors may pursue recovery on claims directly or may use recovery agents other than us in connection with the Assignor's efforts to recover on claims.***
>
> With respect to the Assignors of the assigned claims, some of our agreements exclude from the assignment of claims those claims that are assigned to or being pursued by other recovery vendors of the Assignor at the time of the assignment. We have identified instances where the Assignor did not filter its data provided to us to account for such exclusions. This resulted in some claims being identified by us for purposes of our recovery estimates. This also has resulted in other recovery agents of the Assignor making collections on claims that we previously believed were assigned to us. Although we endeavor to seek appropriate clarification from Assignors to properly identify claims

that are being pursued by other recovery vendors, due to the nature and volume of data, it may not be possible to identify with precision all such claims. While we do not believe any overlap with other recovery vendors with respect to assigned claims to be material, there can be no assurance as to the ultimate impact on our recoveries or our business.

43.     This statement was materially false and misleading because there was and is a heightened risk of assignors choosing to do business with recovery agents other than MSP Recovery as a result of its inability to pay assignors as agreed.

44.     The Proxy contained the following statement:

*If our existing Assignors prematurely terminate their agreement with us or if either party materially breaches an agreement, and we can no longer receive future assignments of healthcare claims recoveries, it could have a material adverse effect on our business, financial condition and results of operations.*
We expect in the future to derive, a significant portion of our revenue from our existing Assignors and, accordingly, we are reliant on ongoing data transfers and the associated assignments of claims from existing Assignors. As a result, maintaining these relationships is critical to our future growth and our business, financial condition and results of operations. We may experience significantly more difficulty than we anticipate in maintaining our existing Assignor agreements. Factors that may affect our ability to continue providing our services under such agreements for our services and our ability to sell additional solutions include:
- the price, performance and functionality of our solutions;
- the availability, price, performance and functionality of competing solutions;
- our Assignors' perceived ability to review claims accurately using their internal resources;
- our ability to develop complementary solutions;
- our continued ability to access the data necessary to enable us to effectively develop and deliver new solutions to Assignors;
- the stability and security of our platform;
- changes in healthcare laws, regulations or trends; and
- the business environment of our Assignors.
Pursuant to the claims recovery and assignment agreements with our Assignors, the Assignors may choose to discontinue one or more services under an existing contract, may exercise flexibilities within their contracts to adjust service volumes, may breach or terminate the contract prior to its agreed upon completion date. A material breach by either party to the agreement may also result in the termination of receiving future claims. Any such occurrences could reduce our revenue from these Assignors. Although a cancellation or termination of a contract does not revoke the original assignment from our Assignors in many instances because such assignment was irrevocable, termination still affects future transfers of data and future assignment of claims. Accordingly, such cancellations or terminations can constrain our growth and result in a decrease in revenue which could have a material adverse effect on our business, financial condition and

results of operations.

45.     This statement was materially false and misleading because the Company did not have the means to fulfil its contractual obligations to pay, among others, Cano Health, in full and on time.

46.     The Proxy contained the following section on risks related to developing relationships with new assignors:

> ***If we are unable to develop new Assignor relationships, it could have a material adverse effect on our business, financial condition and results of operations.***
>
> As part of our strategy, we seek to develop new Assignor relationships, principally among healthcare payers and providers. Our ability to develop new relationships depends on a variety of factors, including the quality and performance of our solutions, as well as the ability to market and sell our solutions effectively and differentiate ourselves from our competitors. We may not be successful in developing new Assignor relationships. If we are unable to develop new Assignor relationships, it could have a material adverse effect on our business, financial condition and results of operations.

47.     This statement was materially false and misleading because Legacy and now post-Merger MSP is at a heightened risk of failing to develop new assignor relationships as a result of its failure to pay Cano Health, which eventually led to a lawsuit in Florida state court.

48.     The Proxy contained the following risk disclosure regarding the Company's relatively small number of assignors:

> ***A significant portion of our claims comes from a limited number of Assignors, and the loss of one or more of these Assignors could have a material adverse effect on our business, financial condition and results of operations.***
>
> We have acquired a significant portion of our claims from and entered into agreements for new services with a limited number of large Assignors. These Assignors assign these claims with an irrevocable assignment from the Assignor to us ("assignment agreement") each with different and/or staggered terms. In addition, we also rely on our reputation and recommendations from key Assignors to promote our solutions to potential new Assignors. Further, our ability to pursue a significant portion of our claims depends on our arrangements pursuant to which we are granted access to health care data, which may be terminated upon the occurrence of certain events. See "—We use various data sources in our business and if we lose access to those data sources it could have a material

> adverse effect on our business, financial condition, and results of operations." Accordingly, if any of these Assignors fail to renew or terminate their existing agreements with us, it could have a material adverse effect on our business, financial condition and results of operations.

49. This statement was materially false and misleading because, at the time it was made, the Company had already begun to deal in bad faith with Cano Health, resulting in a heightened risk of a loss of Cano Health as an assignor.

50. The Proxy contained the following section on litigation risk:

> ***We are currently party to and may in the future become party to additional litigation, regulatory, or other dispute resolution proceedings. Adverse judgments or settlements in any of these proceedings could have a material adverse effect on our business, financial condition and results of operations.***
>
> We are currently party to may in the future become party to lawsuits and other claims against us that arise from time to time in the ordinary course of our business. These may include lawsuits and claims related to, for example, contracts, subcontracts, protection of confidential information or trade secrets, wage and benefits, employment of our workforce or compliance with any of a wide array of state and federal statutes, rules and regulations that pertain to different aspects of our business. We also may be required to initiate expensive litigation or other proceedings to protect our business interests. In addition, because of the payments we may receive from potential future government Assignors, we may become subject to unexpected inquiries, investigations, legal actions or enforcement proceedings pursuant to the False Claims Act, healthcare fraud, waste and abuse laws or similar legislation. Any investigations, settlements or adverse judgments stemming from such legal disputes or other claims may result in significant monetary damages or injunctive relief against us, as well as reputational injury that could adversely affect us. In addition, litigation and other legal claims are subject to inherent uncertainties and management's view of currently pending legal matters may change in the future. Those uncertainties include, but are not limited to, costs of litigation, unpredictable judicial or jury decisions and the differing laws and judicial proclivities regarding damage awards among the states in which we operate. Unexpected outcomes in such legal proceedings, or changes in management's evaluation or predictions of the likely outcomes of such proceedings (possibly resulting in changes in established reserves), could have a material adverse effect on our business, financial condition and results of operations.

51. This statement was materially false and misleading because the Company was at a heightened risk of litigation materially affecting its business as a result of its failure to deal in good faith with assignors, including Cano Health.

52. The Proxy contained the following disclosure on Legacy MSP's competition:

***We face significant competition and we expect competition to increase.***

Competition among providers of healthcare payment accuracy solutions to U.S. healthcare insurance companies is strong and we may encounter additional competition as new competitors enter this area.

Our current healthcare solutions competitors include:
- other payment accuracy vendors, including vendors focused on discrete aspects of the healthcare payment accuracy process;
- fraud, waste and abuse claim edit and predictive analysis companies;
- primary claims processors;
- numerous regional utilization management companies;
- in-house payment accuracy capabilities;
- Medicare RACs; and
- healthcare consulting firms and other third-party liability service providers.

***We may not be able to compete successfully against existing or new competitors. In addition, we may be forced to increase the consideration we provide for assigned claims or lower our pricing, or the demand for our data-driven solutions may decrease as a result of increased competition****. **Further, a failure to be responsive to our existing and potential Assignors' needs could hinder our ability to maintain or expand our Assignor base, hire and retain new employees, pursue new business opportunities, complete future acquisitions and operate our business effectively**. Any inability to compete effectively could have a material adverse effect on our business, financial condition and results of operations.

(Emphasis added).

53. This statement was materially false and misleading because it did not state that the post-Merger Company would have substantial difficulty paying a higher price for assigned claims, or that it was already unable to be "responsive to [existing Assignors' needs]", considering that it would not be able to pay Cano Health for the assigned claims.

54. The Proxy contained the following disclosure on risks involving the dominance of certain Directors:

***After completion of the Business Combination, we will be controlled by the Members, including John H. Ruiz and Frank C. Quesada, whose interests may conflict with our interests and the interests of other stockholders.***

13

Upon completion of the Business Combination, assuming (1) the no redemption scenario and (2) that the holders of the Company's existing Public Warrants and Private Warrants exercise those warrants, and no New Warrants are exercised, the Members (or their designees) will hold all of our issued and outstanding Class V Common Stock, which will control approximately 99.1% of the combined voting power of our common stock, and John H. Ruiz and Frank C. Quesada, as a group, will control approximately 92.58% of the combined voting power of our common stock. Such ownership percentage will be affected by the level of redemptions by Public Stockholders and the exercise of outstanding warrants or New Warrants. See "Summary— Ownership of the Post-Combination Company." The Members will effectively have the ability to determine all corporate actions requiring stockholder approval, including the election and removal of directors, any amendment to our certificate of incorporation or bylaws, or the approval of any merger or other significant corporate transaction, including a sale of substantially all of our assets. This could have the effect of delaying or preventing a change in control or otherwise discouraging a potential acquirer from attempting to obtain control of the Post-Combination Company, which could cause the market price of our Class A Common Stock to decline or prevent stockholders from realizing a premium over the market price for Class A Common Stock. The Members interests may conflict with our interests as a company or the interests of our other stockholders.

55.     This statement was materially false and misleading because it did not disclose that there was a heightened risk of member interests conflicting with those of everyday stockholders as a result of Defendant Ruiz being in effective control of the Company while also being the principal of MSP Recovery Aviation, LLC, as discussed below in paragraph 58.

56.     The Proxy contained the following disclosure on MSP Recovery Aviation, LLC, an entity owned by Defendant Ruiz:

Historically, MSP has been provided with aviation services pursuant to an Air Transportation Services Agreement, dated June 3, 2019, by and between MSP Recovery Aviation, LLC ("MSP Aviation") and Series MRCS, a designated series of MDA Series, LLC, pursuant to which MSP Aviation agreed to provide Series MRCS and its affiliates with air transportation services via its private, non-commercial plane. In exchange for such services, Series MRCS agreed to reimburse MSP Aviation for aircraft rental and flight time along with related fees, expenses and taxes in accordance with a lease agreement for each flight. MSP Aviation is owned by John H. Ruiz.

During the years ended December 31, 2021 and December 31, 2020, MSP Aviation was paid $179,000 and $705,000 for aviation services provided to the MSP Purchased Companies. During the years ended December 31, 2021 and December 31, 2020, MSP Aviation was paid $0 and $1.1 million, respectively, for aviation services provided to Series MRCS. Management of MSP intends to continue its relationship with MSP

Aviation under an informal arrangement that provides MSP and its representatives with economic terms that are at least no less favorable than the terms it would receive if it were to engage an unrelated third party to provide substantially similar services.

57.    This statement was materially false and misleading because it did not disclose that, among other planes owned by MSP Recovery Aviation, LLC is a luxury Boeing 767 which was previously owned by the Australian airline Qantas. This same Boeing 767 has been represented by Defendant Ruiz in the media to be his personal aircraft, and has various luxury features. The *Miami New Times* even described it as a "luxury penthouse that can fly", and as such, while the Proxy stated that MSP would have an arrangement that was on "economic terms that are at least no less favorable than the terms it would receive if it were to engage an unrelated third party to provide substantially similar services", it did not state that by those services, it meant flights on a "luxury penthouse that can fly".

58.    On July 1, 2022, the Company filed with the SEC a Registration Statement (the "Registration Statement") on Form S-1, which in combination with a subsequent amendment on Form S-1/A (the "Amended Registration Statement") and filed pursuant to Rule 429 of the Securities Act, would be used for the offering of up to 755,200,000 warrants and up to 1,032,578,731 shares of Class A Common Stock underlying warrants.

59.    As mentioned, the Registration Statement was signed by Defendants Ruiz, Hamstra, Rivera, Quesada, Plasencia, Sternberg, Meltzer, Assapimonwait, Arrigo, and Hawkins, and was declared effective by the SEC on August 5, 2022.

60.    The Registration Statement was negligently prepared and, as a result, contained untrue statements of material facts or omitted to state other facts necessary to make the statements made not misleading, and was not prepared in accordance with the rules and regulations governing its preparation.

61. Under applicable SEC rules and regulations, the Registration Statement was required to disclose known trends, events or uncertainties that were having, and were reasonably likely to have, an impact on the Company's continuing operations.

62. The Registration Statement contained the following statement on the Company's history:

*We have a history of net losses and no substantial revenue to date, and we may not achieve recoveries, generate significant revenue or achieve profitability. Our relatively limited operating history makes it difficult to evaluate our current business and future prospects and increases the risk of your investment.*

Our relatively limited operating history makes it difficult to evaluate our current business and plan for our future growth. MSP Recovery started in 2014 with its very first assignment from a health plan in Miami, Florida. To date we have achieved no substantial revenue and limited actual recoveries from our assigned claims, and there is no guarantee that we will achieve recoveries, revenue and profitability as we have projected. We have encountered and will continue to encounter significant risks and uncertainties frequently experienced by new and growing companies in rapidly changing industries, such as determining appropriate investments for our limited resources, competition from other data analytics companies, ***acquiring and retaining Assignors***, hiring, integrating, training and retaining skilled personnel, unforeseen expenses, challenges in forecasting accuracy and successfully integrating new strategies. If we are unable to achieve actual recoveries, ***increase our Assignor base***, successfully manage our recovery efforts from third-party payers or successfully expand, our revenue and our ability to achieve and sustain profitability would be impaired. If our assumptions regarding these and other similar risks and uncertainties, which we use to plan our business, are incorrect or change as we gain more experience operating our business or due to changes in our industry, or if we do not address these challenges successfully, our operating and financial results could differ materially from our expectations and our business could suffer.

(Emphasis added).

63. This statement was materially false and misleading because the Company was at a heightened risk of not being able to acquire or retain assignors or increase its assignor base as a result of its poor financial health.

64. The Registration Statement contained the following disclosure on assumption of risk:

16

> ***Under most of our agreements with Assignors, we assume the risk of failure to recover on the assigned claims, and if we fail to make recoveries with respect to the assigned claims receivables and therefore, are unable to generate recovery proceeds greater than or equal to the amounts paid by us to purchase the assigned claims, it can adversely affect our business.***
>
> In many instances, we pay our Assignors an upfront purchase price for assignment of their healthcare claims recoveries. Accordingly, there is a risk that we may not successfully recapture the upfront purchase price if we fail to make recoveries with respect to the assigned claims. If we fail to generate significant recovery proceeds with respect to the assigned claims, it would have an adverse effect on our profitability and business.

65.     This statement was materially false and misleading because, as a result of issues with even paying the assignors in the first place, there was a substantial risk that assignors would sue the Company and seek to regain ownership of assigned claims. Further, litigation with assignors over disputed claims could also have an adverse effect on the Company's profitability.

66.     The Registration Statement contained the following disclosure on assignment validity:

> ***Our assignments can be deemed invalid in court which could adversely affect our recoveries and business.***
>
> We typically receive assignments of healthcare claims recoveries from our Assignors via irrevocable assignments. Accordingly, we are able to pursue those claims that our Assignors originally owned. Enforceability of our assignment agreements are often challenged by defendants in court. If a court determines that an assignment agreement is invalid (whether due to a technical deficiency or regulatory prohibition or otherwise), we will lose the ability to pursue those claims. This can adversely affect our recovery efforts and our business.

67.     The Company materially understated the risk of an assignment being deemed invalid, given that it did not and does not have the means to pay for its assignments, which could lead a court to deem the assignment invalid.

68.     The Registration Statement contained the following disclosure on assignors opting to pursue claims directly or opting to use other recovery agents:

***Assignors may pursue recovery on claims directly or may use recovery agents other than us in connection with the Assignor's efforts to recover on claims.***

With respect to the Assignors of the assigned claims, some of our agreements exclude from the assignment of claims those claims that are assigned to or being pursued by other recovery vendors of the Assignor at the time of the assignment. We have identified instances where the Assignor did not filter its data provided to us to account for such exclusions. This resulted in some claims being identified by us for purposes of our recovery estimates. This also has resulted in other recovery agents of the Assignor making collections on claims that we previously believed were assigned to us. Although we endeavor to seek appropriate clarification from Assignors to properly identify claims that are being pursued by other recovery vendors, due to the nature and volume of data, it may not be possible to identify with precision all such claims. While we do not believe any overlap with other recovery vendors with respect to assigned claims to be material, there can be no assurance as to the ultimate impact on our recoveries or our business.

69.     This statement was materially false and misleading because it understated the

likelihood of assignors opting to pursue claims directly or turn to the Company's competitors as

a result of its inability to pay existing assignors in full for claims.

70.     The Registration Statement contained the following disclosure on the Company's

future growth:

***Our business and future growth depend on our ability to successfully expand the volume of our healthcare claims and obtain data from new Assignors and healthcare claims from our existing Assignor base.***

We expect a significant portion of our future revenue growth to come from expanding the volume of claims we are assigned; this includes obtaining claims and data from new Assignors as well as our existing Assignors. Our efforts to do so may not be successful. If we are unable to successfully expand the scope of healthcare claims assigned from potential and existing Assignors, it could have a material adverse effect on our growth and on our business, financial condition and results of operations.

71.     This statement was materially false and misleading because it did not disclose that

it was unlikely to substantially expand the volume of healthcare claims assigned to it as a result

of its inability to pay in full for existing claims. Further, its inability to pay in full for existing

claims could lead to litigation, further reducing the likelihood of new assignors doing business

with the Company.

72.     The Registration Statement contained the following disclosure on the premature

termination of agreements between assignors of claims and the Company:

> *If our existing Assignors prematurely terminate their agreement with us or if either*
> *party materially breaches an agreement, and we can no longer receive future*
> *assignments of healthcare claims recoveries, it could have a material adverse effect on*
> *our business, financial condition and results of operations.*
>
> We expect in the future to derive, a significant portion of our revenue from our existing
> Assignors and, accordingly, we are reliant on ongoing data transfers and the associated
> assignments of claims from existing Assignors. As a result, maintaining these
> relationships is critical to our future growth and our business, financial condition and
> results of operations. We may experience significantly more difficulty than we anticipate
> in maintaining our existing Assignor agreements. Factors that may affect our ability to
> continue providing our services under such agreements for our services and our ability to
> sell additional solutions include:
> - the price, performance, and functionality of our solutions;
> - the availability, price, performance, and functionality of competing solutions;
> - our Assignors' perceived ability to review claims accurately using their internal
>   resources;
> - our ability to develop complementary solutions;
> - our continued ability to access the data necessary to enable us to effectively
>   develop and deliver new solutions to Assignors;
> - the stability and security of our platform;
> - changes in healthcare laws, regulations, or trends; and
> - the business environment of our Assignors.
>
> Pursuant to the claims recovery and assignment agreements with our Assignors, the
> Assignors may choose to discontinue one or more services under an existing contract,
> may exercise flexibilities within their contracts to adjust service volumes, may breach or
> terminate the contract prior to its agreed upon completion date. A material breach by
> either party to the agreement may also result in the termination of receiving future claims.
> Any such occurrences could reduce our revenue from these Assignors. Although a
> cancellation or termination of a contract does not revoke the original assignment from our
> Assignors in many instances because such assignment was irrevocable, termination still
> affects future transfers of data and future assignment of claims. Accordingly, such
> cancellations or terminations can constrain our growth and result in a decrease in revenue
> which could have a material adverse effect on our business, financial condition and results
> of operations.

73.     This statement was materially false and misleading because it underplayed the

substantial likelihood of existing assignors choosing not to do business in the future as a result of

the Company's inability to pay them in full and on time.

74.     The Registration Statement contained the following disclosure on a failure to develop new assignor relationships:

***If we are unable to develop new Assignor relationships, it could have a material adverse effect on our business, financial condition and results of operations.***

As part of our strategy, we seek to develop new Assignor relationships, principally among healthcare payers and providers. Our ability to develop new relationships depends on a variety of factors, including the quality and performance of our solutions, as well as the ability to market and sell our solutions effectively and differentiate ourselves from our competitors. We may not be successful in developing new Assignor relationships. If we are unable to develop new Assignor relationships, it could have a material adverse effect on our business, financial condition and results of operations.

75.     This statement was materially false and misleading because the Company knew or should have known that over time it would be difficult to maintain existing relationships with assignors, much less develop material relationships with new assignors, as a result of the Company's poor finances and corresponding inability to pay assignors in full and on time.

76.     The Registration Statement contained the following risk disclosure on the risk of having significant portions of its claims coming from a limited number of assignors:

***A significant portion of our claims comes from a limited number of Assignors, and the loss of one or more of these Assignors could have a material adverse effect on our business, financial condition and results of operations.***

We have acquired a significant portion of our claims from and entered into agreements for new services with a limited number of large Assignors. These Assignors assign these claims with an irrevocable assignment from the Assignor to us ("assignment agreement") each with different and/or staggered terms. In addition, we also rely on our reputation and recommendations from key Assignors to promote our solutions to potential new Assignors.

Further, our ability to pursue a significant portion of our claims depends on our arrangements pursuant to which we are granted access to health care data, which may be terminated upon the occurrence of certain events. See "- We use various data sources in our business and if we lose access to those data sources it could have a material adverse effect on our business, financial condition, and results of operations." Accordingly, if any of these Assignors fail to renew or terminate their existing agreements with us, it could have a material adverse effect on our business, financial condition and results of operations.

77.     This was materially false and misleading because it understated the risk of a significant portion of claims coming from a small number of assignors, considering that it could not afford to pay existing assignors with which it had important and material agreements, such as Cano Health, in full and on time under the terms of its agreements.

78.     The Registration Statement contained the following disclosure on competition:

***We face significant competition and we expect competition to increase.***

Competition among providers of healthcare payment accuracy solutions to U.S. healthcare insurance companies is strong and we may encounter additional competition as new competitors enter this area.

Our current healthcare solutions competitors include:
- other payment accuracy vendors, including vendors focused on discrete aspects of the healthcare payment accuracy process;
- fraud, waste, and abuse claim edit and predictive analysis companies;
- primary claims processors;
- numerous regional utilization management companies;
- in-house payment accuracy capabilities;
- Medicare RACs; and
- Healthcare consulting firms and other third-party liability service providers.

We may not be able to compete successfully against existing or new competitors. In addition, ***we may be forced to increase the consideration we provide for assigned claims or lower our pricing, or the demand for our data-driven solutions may decrease as a result of increased competition***. Further, a failure to be responsive to our existing and potential Assignors' needs could hinder our ability to maintain or expand our Assignor base, hire and retain new employees, pursue new business opportunities, complete future acquisitions and operate our business effectively. Any inability to compete effectively could have a material adverse effect on our business, financial condition and results of operations.

(Emphasis added).

79.     This statement was materially false and misleading because the Company failed to disclose that it could not afford to increase the consideration provided for assigned claims, considering that it could not presently afford to pay assignors such as Cano Health in full.

80.     The Registration Statement contained the following disclosure on brand

21

awareness and reputational risk:

> *If we fail to cost-effectively develop widespread brand awareness and maintain our reputation, or if we fail to achieve and maintain market acceptance, our business could suffer.*
>
> We believe that maintaining and enhancing our reputation and brand recognition is critical to our relationships with our Assignors and ability to attract new Assignors. The promotion of our brand may require us to make substantial investments and we anticipate that, as our market becomes increasingly competitive, these marketing initiatives may become increasingly difficult and expensive. Our marketing activities may not be successful or yield increased revenue, and to the extent that these activities yield increased revenue, the increased revenue may not offset the expenses we incur, and our results of operations could be harmed. *In addition, any factor that diminishes our reputation or that of our management, including failing to meet expectations, or any adverse publicity or litigation involving or surrounding us, could make it substantially more difficult for us to attract new Assignors*. In addition, negative publicity resulting from any adverse government audit could injure our reputation. If we do not successfully maintain and enhance our reputation and brand recognition, our business may not grow and we could lose our relationships with Assignors, which would harm our business, results of operations and financial condition.
>
> (Emphasis added).

81.     This disclosure was materially false and misleading because it did not disclose that the Company was at a heightened risk of litigation which could affect its reputation, considering that it was unable to pay Cano Health in full and on time, which eventually led to a lawsuit.

82.     The Registration Statement contained the following section on litigation risk:

> *We are currently party to and may in the future become party to additional litigation, regulatory, or other dispute resolution proceedings. Adverse judgments or settlements in any of these proceedings could have a material adverse effect on our business, financial condition and results of operations.*
>
> We are currently party to may in the future become party to lawsuits and other claims against us that arise from time to time *in the ordinary course of our business*. These may include lawsuits and claims related to, for example, contracts, subcontracts, protection of confidential information or trade secrets, wage and benefits, employment of our workforce or compliance with any of a wide array of state and federal statutes, rules and regulations that pertain to different aspects of our business. *We also may be required to initiate expensive litigation or other proceedings to protect our business interests*. In

addition, because of the payments we may receive from potential future government Assignors, we may become subject to unexpected inquiries, investigations, legal actions or enforcement proceedings pursuant to the False Claims Act, healthcare fraud, waste and abuse laws or similar legislation. Any investigations, settlements or adverse judgments stemming from such legal disputes or other claims may result in significant monetary damages or injunctive relief against us, as well as reputational injury that could adversely affect us. In addition, litigation and other legal claims are subject to inherent uncertainties and management's view of currently pending legal matters may change in the future. Those uncertainties include, but are not limited to, costs of litigation, unpredictable judicial or jury decisions and the differing laws and judicial proclivities regarding damage awards among the states in which we operate. Unexpected outcomes in such legal proceedings, or changes in management's evaluation or predictions of the likely outcomes of such proceedings (possibly resulting in changes in established reserves), could have a material adverse effect on our business, financial condition and results of operations.

(Emphasis added).

83.     The Registration Statement contained the following disclosure on risk relating to

Defendants Ruiz and Quesada, among others, controlling the Company:

***We are controlled by the Members, including John H. Ruiz and Frank C. Quesada, whose interests may conflict with our interests and the interests of other stockholders.***

The Members (or their designees) hold all of our issued and outstanding Class V Common Stock, which control approximately 97.9% of the combined voting power of our common stock, and John H. Ruiz and Frank C. Quesada, as a group, control approximately 97.8% of the combined voting power of our common stock. See "Beneficial Ownership of Securities." ***They effectively have the ability to determine all corporate actions requiring stockholder approval, including the election and removal of directors, any amendment to our certificate of incorporation or bylaws, or the approval of any merger or other significant corporate transaction, including a sale of substantially all of our assets***. This could have the effect of delaying or preventing a change in control or otherwise discouraging a potential acquirer from attempting to obtain control of the Company, which could cause the market price of our Class A Common Stock to decline or prevent stockholders from realizing a premium over the market price for Class A Common Stock. ***The Members' interests may conflict with our interests as a company or the interests of our other stockholders***.

(Emphasis added)

84.     This statement was materially false and misleading because it said the interests

"may" conflict with those of stockholders, rather than that the interests of Ruiz, among others,

were conflicting with other stockholders at the time that statement was made. Specifically, Ruiz's interests conflicted with those of everyday stockholders through the Company's business relationship with MSP Recovery Aviation LLC, which Ruiz owns and through which he maintains control of luxury aircraft including a Boeing 767 modified to have a master bedroom for Ruiz, among other luxury amenities. As a result, stockholders effectively pay Ruiz to travel in a plane that has been described by the *Miami New Times* as a "luxury penthouse that can fly".

85.     This statement was materially false and misleading because the Company did not disclose that, contrary to litigation occurring in the "ordinary course of business", it was at a heightened risk of litigation as a result of being unable to pay assignors for health care claims, a crucial component of its business.

86.     On August 12, 2022, MSP Recovery filed with the SEC its quarterly report on Form 10-Q for the period ended June 30, 2022 (the "2Q22 Report"). Attached to the 2Q22 Report were certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") signed by defendants Ruiz and Hamstra attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting, and the disclosure of all fraud.

87.     The 2Q22 Report contained the following disclosure on the Company's business history:

> ***We have a history of net losses and no substantial revenue to date, and we may not achieve recoveries, generate significant revenue or achieve profitability. Our relatively limited operating history makes it difficult to evaluate our current business and future prospects and increases the risk of your investment.***
>
> Our relatively limited operating history makes it difficult to evaluate our current business and plan for our future growth. MSP Recovery started in 2014 with its very first assignment from a health plan in Miami, Florida. To date, we have achieved no substantial revenue and limited actual recoveries from our assigned claims, and there is no guarantee that we will achieve recoveries, revenue and profitability as we have

projected. We have encountered and will continue to encounter significant risks and uncertainties frequently experienced by new and growing companies in rapidly changing industries, such as determining appropriate investments for our limited resources, competition from other data analytics companies, *acquiring and retaining Assignors*, hiring, integrating, training and retaining skilled personnel, unforeseen expenses, challenges in forecasting accuracy and successfully integrating new strategies. If we are unable to achieve actual recoveries, *increase our Assignor base*, successfully manage our recovery efforts from third-party payers or successfully expand, our revenue and our ability to achieve and sustain profitability would be impaired. If our assumptions regarding these and other similar risks and uncertainties, which we use to plan our business, are incorrect or change as we gain more experience operating our business or due to changes in our industry, or if we do not address these challenges successfully, our operating and financial results could differ materially from our expectations and our business could suffer.

(Emphasis added).

88.     This statement was materially false and misleading because it did not disclose that it was likely for the Company to have difficulty increasing its base of assignors as a result of not having the resources to pay existing assignors. It also did not disclose the risks of retaining existing assignors as well as litigation risk stemming from relations with existing assignors as a result of the failure to properly compensate assignors for claims.

89.     The 2Q22 Report contained the following disclosure on assumption of risk of failure to recover:

> *Under most of our agreements with Assignors, we assume the risk of failure to recover on the assigned claims, and if we fail to make recoveries with respect to the assigned claims receivables and therefore, are unable to generate recovery proceeds greater than or equal to the amounts paid by us to purchase the assigned claims, it can adversely affect our business.*
>
> In many instances, we pay our Assignors an upfront purchase price for assignment of their healthcare claims recoveries. Accordingly, there is a risk that we may not successfully recapture the upfront purchase price if we fail to make recoveries with respect to the assigned claims. If we fail to generate significant recovery proceeds with respect to the assigned claims, it would have an adverse effect on our profitability and business.

90.     This statement was materially false and misleading because it omitted that, at

least with respect to the major assignor Cano Health, the Company did not pay it an upfront purchase price. Instead, the Company agreed to pay Cano Health in Company stock, but then failed to do so, resulting in a lawsuit.

91.     The 2Q22 Report contained the following disclosure on assignment validity:

***Our assignments can be deemed invalid in court which could adversely affect our recoveries and our business.***

We typically receive assignments of healthcare claims recoveries from our Assignors via irrevocable assignments. Accordingly, we are able to pursue those claims that our Assignors originally owned. Enforceability of our assignment agreements is often challenged by defendants in court. If a court determines that an assignment agreement is invalid (whether due to a technical deficiency or regulatory prohibition or otherwise), we will lose the ability to pursue those claims. This can adversely affect our recovery efforts and our business.

92.     This statement was materially false and misleading because it did not disclose that the Company was plausibly at a higher risk of an assignment being deemed invalid if, for example, it emerged that the Company was in breach of contract with respect to that assigned claim.

93.     The 2Q22 Report contained the following disclosure on assignors opting to pursue claims directly or use other recovery agents aside from the Company:

***Assignors may pursue recovery on claims directly or may use recovery agents other than us in connection with the Assignor's efforts to recover on claims.***

With respect to the Assignors of the assigned claims, some of our agreements exclude from the assignment of claims those claims that are assigned to or being pursued by other recovery vendors of the Assignor at the time of the assignment. We have identified instances where the Assignor did not filter its data provided to us to account for such exclusions. This resulted in some claims being identified by us for purposes of our recovery estimates. This also has resulted in other recovery agents of the Assignor making collections on claims that we previously believed were assigned to us. Although we endeavor to seek appropriate clarification from Assignors to properly identify claims that are being pursued by other recovery vendors, due to the nature and volume of data, it may not be possible to identify with precision all such claims. While we do not believe that there is any overlap with other recovery vendors with respect to assigned claims to be material, there can be no assurance as to the ultimate impact on our recoveries or our

26

business.

94.     This disclosure was materially false and misleading because it did not state that there was a heightened risk of assignors opting to pursue recovery directly as a result of its failure to pay them as per the applicable contract.

95.     The 2Q22 Report contained the following disclosure on the premature termination of assignment agreements, as well as on breach of contract:

*If our existing Assignors prematurely terminate their agreement with us or if either party materially breaches an agreement, and we can no longer receive future assignments of healthcare claims recoveries, it could have a material adverse effect on our business, financial condition and results of operations.*

*We expect in the future to derive a significant portion of our revenue from our existing Assignors and, accordingly, we are reliant on ongoing data transfers and the associated assignments of claims from existing Assignors. As a result, maintaining these relationships is critical to our future growth and our business, financial condition and results of operations. We may experience significantly more difficulty than we anticipate in maintaining our existing Assignor agreements. Factors that may affect our ability to continue providing our services under such agreements for our services and our ability to sell additional solutions include*:

- the price, performance and functionality of our solutions;
- the availability, price, performance and functionality of competing solutions;
- our Assignors' perceived ability to review claims accurately using their internal resources;
- our ability to develop complementary solutions;
- our continued ability to access the data necessary to enable us to effectively develop and deliver new solutions to Assignors;
- the stability and security of our platform;
- changes in healthcare laws, regulations, or trends; and
- the business environment of our Assignors.

Pursuant to the claims recovery and assignment agreements with our Assignors, the Assignors may choose to discontinue one or more services under an existing contract, may exercise flexibilities within their contracts to adjust service volumes, and may breach or terminate the contract prior to its agreed upon completion date. A material breach by either party to the agreement may also result in the termination of receiving future claims. Any such occurrences could reduce our revenue from these Assignors. Although a cancellation or termination of a contract does not revoke the original assignment from our Assignors in many instances because such assignment was irrevocable, termination still affects future transfers of data and future assignment of

27

claims. Accordingly, such cancellations or terminations can constrain our growth and result in a decrease in revenue, which could have a material adverse effect on our business, financial condition and results of operations.

(Emphasis added).

96.     This statement was materially false and misleading because it did not disclose that the Company was at a heightened risk of failing to maintain its current assignor relationships, most pertinently with Cano Health, as a result of not honoring its end of applicable contracts.

97.     The 2Q22 Report contained the following disclosure on concentration of risk in terms of its limited number of assignors:

> *A significant portion of our claims comes from a limited number of Assignors, and the loss of one or more of these Assignors could have a material adverse effect on our business, financial condition and results of operations.*
>
> We have acquired a significant portion of our claims from and entered into agreements for new services with a limited number of large Assignors. These Assignors assign these claims with an irrevocable assignment from the Assignor to us ("assignment agreement") each with different and/or staggered terms. In addition, we also rely on our reputation and recommendations from key Assignors to promote our solutions to potential new Assignors.
>
> Further, our ability to pursue a significant portion of our claims depends on our arrangements pursuant to which we are granted access to health care data, which may be terminated upon the occurrence of certain events. See "- We use various data sources in our business and if we lose access to those data sources it could have a material adverse effect on our business, financial condition, and results of operations." Accordingly, if any of these Assignors fail to renew or terminate their existing agreements with us, it could have a material adverse effect on our business, financial condition and results of operations.

98.     This statement was materially false and misleading because it did not disclose that it was at a heightened risk of Cano Health terminating its relationship with the Company and resorting to litigation as a result of the Company's failure to pay Cano Health as per its contractual obligations.

99.     The 2Q22 Report contained the following disclosure on competition:

*We face significant competition and we expect competition to increase.*

Competition among providers of healthcare payment accuracy solutions to U.S. healthcare insurance companies is strong and we may encounter additional competition as new competitors enter this area.

Our current healthcare solutions competitors include:

- other payment accuracy vendors, including vendors focused on discrete aspects of the healthcare payment accuracy process;
- fraud, waste, and abuse claim edit and predictive analysis companies;
- primary claims processors;
- numerous regional utilization management companies;
- in-house payment accuracy capabilities;
- Medicare RACs; and
- Healthcare consulting firms and other third-party liability service providers.

We may not be able to compete successfully against existing or new competitors. ***In addition, we may be forced to increase the consideration we provide for assigned claims or lower our pricing, or the demand for our data-driven solutions may decrease as a result of increased competition. Further, a failure to be responsive to our existing and potential Assignors' needs could hinder our ability to maintain or expand our Assignor base, hire and retain new employees, pursue new business opportunities, complete future acquisitions and operate our business effectively***. Any inability to compete effectively could have a material adverse effect on our business, financial condition and results of operations.

(Emphasis added).

100.    This statement was materially false and misleading because it did not disclose that

the Company would not be able to pay increased consideration for assigned claims, considering

that it was not able to pay for existing assigned claims, most pertinently to Cano Health.

101.    The 2Q22 Report contained the following disclosure on legal compliance:

We are subject to extensive government regulation. Any violation of the laws and regulations applicable to us or a negative audit or investigation finding could have a material adverse effect on our business, financial condition and results of operations.

 Much of our business is regulated by the Federal Government and the states in which we operate. The laws and regulations governing our operations generally are intended to benefit and protect individual citizens, including government program beneficiaries, health plan members and providers, rather than stockholders. The government agencies administering these laws and regulations have broad latitude to enforce them. These laws

and regulations regulate how we do business, what services we offer and how we interact with our Assignors, providers, other healthcare payers and the public. Increased involvement by us in analytic or audit work that can have an impact on the eligibility of individuals for medical coverage or specific benefits could increase the likelihood and incidence of us being subjected to scrutiny or legal actions by parties other than our Assignors, based on alleged mistakes or deficiencies in our work, ***with significant resulting costs and strain on our resources***.

In addition, because we may receive payments from federal and state governmental agencies, we may become subject to various laws, including the Federal False Claims Act and similar state statutes, which permit government law enforcement agencies to institute suits against us for violations and, in some cases, to seek double or treble damages, penalties and assessments. In addition, private citizens, acting as whistleblowers, can sue on behalf of the Federal Government under the "qui tam" provisions of the Federal False Claims Act and similar statutory provisions in many states.

The expansion of our operations into new products and services may further expose us to requirements and potential liabilities under additional statutes and legislative schemes that previously have not been relevant to our business, such as banking statutes, that may both increase demands on our resources for compliance activities and subject us to potential penalties for noncompliance with statutory and regulatory standards.

If the government discovers improper or illegal activities in the course of audits or investigations, we may be subject to various civil and criminal penalties and administrative sanctions, which may include termination of contracts, forfeiture of profits, suspension of payments, fines and suspensions and debarment from doing business with the government. Such risks, particularly under the Federal False Claims Act and similar state fraud statutes, have increased in recent years due to legislative changes that have (among other amendments) expanded the definition of a false claim to include, potentially, any unreimbursed overpayment received from, or other monetary debt owed to, a government agency. If we are found to be in violation of any applicable law or regulation, or if we receive an adverse review, audit or investigation, any resulting negative publicity, penalties or sanctions could have an adverse effect on our reputation in the industry, impair our ability to compete for new contracts and have a material adverse effect on our business, financial condition and results of operations.

(Emphasis added).

102.    This statement was materially false and misleading because it discussed hypothetical penalties or investigations generally. Further, it discussed how increased involvement in analytic work by the Company could lead to "significant resulting costs and strain on our resources" as a result of legal action, but did not disclose that, by the time it was

issued, the Securities and Exchange Commission had initiated an investigation into the Company, which could lead to penalties and significant litigation costs and resource strain.

103.    The 2Q22 Report contained the following financial information regarding the indemnification asset, various intangible assets and rights to cash flows:

| (In thousands except per share amounts) | | June 30, 2022 |
|---|---|---|
| **ASSETS** | | |
| **Current assets:** | | |
| Cash and cash equivalents | $ | 25,045 |
| Restricted cash | | 11,420 |
| Accounts receivable | | 901 |
| Affiliate receivable (1) | | 2,111 |
| Indemnification asset (1) | | 719,413 |
| Prepaid expenses and other current assets (1) | | 36,890 |
| **Total current assets** | | **795,780** |
| Property, plant and equipment, net | | 950 |
| Deferred tax asset | | 857 |
| Intangible assets, net | | 2,095,735 |
| Investment in rights to claim recovery cash flows | | 3,673,610 |
| **Total assets** | $ | **6,566,932** |

104.    As the Company later disclosed, these figures were false.

105.    The 2Q22 Report contained the following on internal controls:

Disclosure controls and procedures are controls and other procedures that are designed to ensure that information required to be disclosed in our reports filed or submitted under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms. Disclosure controls and procedures include, without limitation, controls and procedures designed to ensure that information required to be disclosed in our reports filed or submitted under the Exchange Act is accumulated and communicated to our management, including our Chief Executive Officer and Chief Financial Officer, to allow timely decisions regarding required disclosure.

*Evaluation of Disclosure Controls and Procedures*

Management is responsible for establishing and maintaining adequate internal control over financial reporting designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with GAAP. Management is likewise required, on a quarterly basis, to evaluate the effectiveness of its internal controls and to disclose any changes

and material weaknesses identified through such evaluation of those internal controls. A material weakness is a deficiency, or a combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of MSP's annual or interim financial statements will not be prevented or detected and corrected on a timely basis. Effective internal controls are necessary for us to provide reliable financial reports and prevent fraud. We expect to take steps to remediate the material weakness, but there is no assurance that any remediation efforts will ultimately have the intended effects. Prior to the Business Combination, material weaknesses were disclosed for both legacy MSP and LCAP. These are outlined below. As required by Rules 13a-15 and 15d-15 under the Exchange Act, our Chief Executive Officer and Chief Financial Officer carried out an evaluation of the effectiveness of the design and operation of our disclosure controls and procedures as of June 30, 2022. Based upon their evaluation, our Chief Executive Officer and Chief Financial Officer concluded that our disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) under the Exchange Act) were not effective, due to the material weaknesses in our internal control over financial reporting related to the items noted below.

*LCAP*

Following the issuance of the "Staff Statement on Accounting and Reporting Considerations for Warrants issued by Special Purpose Acquisition Companies" by the staff of the SEC (the "SEC Staff Statement"), and after consultation with LCAP's independent registered public accounting firm, LCAP's management and audit committee concluded that, in light of the SEC Staff Statement, it was appropriate to restate previously issued and audited financial statements as of and for the period ended December 31, 2020.

Additionally, LCAP previously recorded a portion of its Class A common stock subject to possible redemption in permanent equity. In accordance with SEC Staff guidance on redeemable equity instruments, ASC 480-10-S99, "Distinguishing Liabilities from Equity", and EITF Topic D-98, "Classification and Measurement of Redeemable Securities", redemption provisions not solely within the control of the issuing company require common stock subject to redemption to be classified outside of permanent equity. LCAP's management re-evaluated the effectiveness of our disclosure controls and procedures and concluded that the misclassification of the Class A common stock was quantitatively material to individual line items within the balance sheet. LCAP concluded that the restatement of the Class A common stock represents a material weakness. In addition, on March 31, 2022, LCAP's management and its audit committee concluded that a disclosure in regard to related parties was not disclosed within the notes to LCAP's audited Financial Statements for the year ended December 31, 2021. As a result, LCAP identified a material weakness in its internal controls over financial reporting.

LCAP also identified a material weakness in its internal control over financial reporting related to the accounting for complex financial instruments. As a result of this material weakness, LCAP's management concluded that its internal control over financial

reporting was not effective as of December 31, 2020. This material weakness resulted in a material misstatement of LCAP's derivative liabilities, change in fair value of derivative liabilities, Class A Common Stock subject to possible redemption, Class A Common Stock, additional paid-in capital, accumulated deficit and related financial disclosures for the period from December 23, 2019 (inception) through December 31, 2020. *For a discussion of management's consideration of the material weakness identified related to LCAP's accounting for a significant and unusual transaction related to the warrants LCAP issued in connection with the IPO, see "Note 2-Restatement of Previously Issued Financial Statements" to LCAP's audited financial statements included in the S-1 Registration Statement filed on July 7, 2022 with the SEC*. In addition, LCAP identified a material weakness in its internal controls over financial reporting as a result of not including certain disclosure in regard to related parties within the notes to its audited Financial Statements for the year ended December 31, 2021. As a result, such financial statements were amended in order to appropriately disclose the related party transaction. See "Certain Relationships and Related Party Transactions " included in the S-1 Registration Statement filed on July 7, 2022 with the SEC.

LCAP has concluded that its internal control over financial reporting was ineffective as of December 31, 2020 and 2021, and MSP Recovery concluded that its internal control over financial reporting was ineffective as of June 30, 2022, because material weaknesses existed in LCAP's internal control over financial reporting and they have not been remedied to date. MSP Recovery has taken a number of measures to remediate the material weaknesses described herein; however, if it is unable to remediate its material weaknesses in a timely manner or MSP Recovery identifies additional material weaknesses, it may be unable to provide required financial information in a timely and reliable manner, and MSP Recovery may incorrectly report financial information.

*MSP Recovery*

As of December 31, 2021 and 2020, the Company has identified material weaknesses in its internal control over financial reporting. The material weaknesses the Company identified were as follows:

- The Company did not have sufficient accounting and financial reporting resources to address its financial reporting requirements. Specifically:
    - The Company did not have sufficient resources with an appropriate level of knowledge and GAAP expertise to identify, evaluate and account for transactions; and
    - the Company did not have an adequate segregation of duties or appropriate level of review that is needed to comply with financial reporting requirements.
- The Company did not design, implement or maintain an effective control environment over our financial reporting requirements. Specifically:
    - The Company did not have effective controls over the period end financial reporting process and preparation of financial statements due to:

- ▪ A lack of a sufficient level of formal accounting policies and procedures that define how transactions should be initiated, recorded, processed and reported; and
- ▪ a lack of an effective control environment over period end close procedure.
  - ○ The Company did not have appropriate controls or documented segregation of duties over information technology systems used to create or maintain financial reporting records;
  - ○ The Company did not design or maintain the appropriate controls related to the separation of accounting records for each entity included within the combined and consolidated financial statements of the Company.

These control deficiencies did not result in errors that were material to the Company's annual financial statements. However, these control deficiencies could result in a misstatement in MSP's accounts or disclosures that would result in a material misstatement to the annual financial statements that would not be prevented or detected. Accordingly, the Company determined that these control deficiencies constitute material weaknesses.

The Company is in the process of implementing measures designed to improve their internal control over financial reporting and remediate the control deficiencies that led to the material weaknesses. *As of June 30, 2022, MSP has hired key accounting personnel with appropriate levels of U.S. generally accepted accounting principles expertise and financial reporting knowledge and experience as well as has begun developing formal accounting policies and procedures, designing a control environment over how transactions are initiated, recorded, processed and reported, and implementing period end close procedures*. The Company also has implemented certain accounting systems to automate manual processes, to help implement segregation of duties and to assist in consolidation and period end close. However, the Company is still in the process of addressing these deficiencies and there is no assurance that these measures will significantly improve or remediate the material weaknesses described above. The Company and their independent registered public accounting firm, were not required to perform an evaluation of the Company's internal control over financial reporting as of December 31, 2021 in accordance with the provisions of the Sarbanes-Oxley Act and as such, there is no assurance that the Company has identified all material weaknesses or that there will not be additional material weaknesses or deficiencies that are identified. While the Company's independent registered public accounting firm is not required to audit the effectiveness of our internal control over financial reporting until after the Company is no longer an "emerging growth company" as defined in the JOBS Act, a failure to design, implement or maintain effective internal control over financial reporting could adversely affect the results of annual independent registered public accounting firm audit reports regarding the effectiveness of the Company's internal control over financial reporting that the Company will eventually be required to include in reports that will be filed with the SEC. If at such time, the Company's independent registered public accounting firm issue an audit report that is adverse due to one or more material weaknesses in the Company's internal control over financial

reporting, this could have a material and adverse effect on the Company's business, results of operations and financial condition, and it could cause a decline in the trading price of the Company's Class A common stock.

(Emphasis added).

106.     This statement was materially false and misleading because, even with the information above, it still understated the significant extent of the Company's material internal control weaknesses, including for the financial information presented in that very report, which would eventually lead to a government investigation.

107.     On November 10, 2022, MSP Recovery filed with the SEC its quarterly report on Form 10-Q for the period ended September 30, 2022 (the "3Q22 Report"). Attached to the 3Q22 Report were certifications pursuant to SOX signed by defendants Ruiz and Hamstra attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting, and the disclosure of all fraud.

108.     The 3Q22 Report stated that the figures for the indemnification asset, various intangible assets were $752,510, $2,077,571, respectively.

109.     As the Company later disclosed, these figures were false.

110.     The 3Q22 Report contained the following section on internal controls:

Disclosure controls and procedures are controls and other procedures that are designed to ensure that information required to be disclosed in our reports filed or submitted under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms. Disclosure controls and procedures include, without limitation, controls and procedures designed to ensure that information required to be disclosed in our reports filed or submitted under the Exchange Act is accumulated and communicated to our management, including our Chief Executive Officer and Chief Financial Officer, to allow timely decisions regarding required disclosure.

*Evaluation of Disclosure Controls and Procedures*

Management is responsible for establishing and maintaining adequate internal control over financial reporting designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with GAAP. Management is likewise required, on a quarterly

basis, to evaluate the effectiveness of its internal controls and to disclose any changes and material weaknesses identified through such evaluation of those internal controls. A material weakness is a deficiency, or a combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of MSP's annual or interim financial statements will not be prevented or detected and corrected on a timely basis. Effective internal controls are necessary for us to provide reliable financial reports and prevent fraud. We expect to take steps to remediate the material weakness, but there is no assurance that any remediation efforts will ultimately have the intended effects. Prior to the Business Combination, material weaknesses were disclosed for both legacy MSP and LCAP. These are outlined below. As required by Rules 13a-15 and 15d-15 under the Exchange Act, our Chief Executive Officer and Chief Financial Officer carried out an evaluation of the effectiveness of the design and operation of our disclosure controls and procedures as of September 30, 2022. Based upon their evaluation, our Chief Executive Officer and Chief Financial Officer concluded that our disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) under the Exchange Act) were not effective, due to the material weaknesses in our internal control over financial reporting related to the items noted below.

*LCAP*

Following the issuance of the "Staff Statement on Accounting and Reporting Considerations for Warrants issued by Special Purpose Acquisition Companies" by the staff of the SEC (the "SEC Staff Statement"), and after consultation with LCAP's independent registered public accounting firm, LCAP's management and audit committee concluded that, in light of the SEC Staff Statement, it was appropriate to restate previously issued and audited financial statements as of and for the period ended December 31, 2020.

Additionally, LCAP previously recorded a portion of its Class A common stock subject to possible redemption in permanent equity. In accordance with SEC Staff guidance on redeemable equity instruments, ASC 480-10-S99, "Distinguishing Liabilities from Equity", and EITF Topic D-98, "Classification and Measurement of Redeemable Securities", redemption provisions not solely within the control of the issuing company require common stock subject to redemption to be classified outside of permanent equity. LCAP's management re-evaluated the effectiveness of our disclosure controls and procedures and concluded that the misclassification of the Class A common stock was quantitatively material to individual line items within the balance sheet. LCAP concluded that the restatement of the Class A common stock represents a material weakness. In addition, on March 31, 2022, LCAP's management and its audit committee concluded that a disclosure in regard to related parties was not disclosed within the notes to LCAP's audited Financial Statements for the year ended December 31, 2021. As a result, LCAP identified a material weakness in its internal controls over financial reporting.

LCAP also identified a material weakness in its internal control over financial reporting related to the accounting for complex financial instruments. As a result of this material weakness, LCAP's management concluded that its internal control over financial reporting was not effective as of December 31, 2020. This material weakness resulted in a material misstatement of LCAP's derivative liabilities, change in fair value of derivative liabilities, Class A Common Stock subject to possible redemption, Class A Common Stock, additional paid-in capital, accumulated deficit and related financial disclosures for the period from December 23, 2019 (inception) through December 31, 2020. For a discussion of management's consideration of the material weakness identified related to LCAP's accounting for a significant and unusual transaction related to the warrants LCAP issued in connection with the IPO, see "Note 2-Restatement of Previously Issued Financial Statements" to LCAP's audited financial statements included in the S-1 Registration Statement filed on July 7, 2022 with the SEC. In addition, LCAP identified a material weakness in its internal controls over financial reporting as a result of not including certain disclosure in regard to related parties within the notes to its audited Financial Statements for the year ended December 31, 2021. As a result, such financial statements were amended in order to appropriately disclose the related party transaction. See "Certain Relationships and Related Party Transactions" included in the S-1 Registration Statement filed on July 7, 2022 with the SEC.

LCAP had concluded that its internal control over financial reporting was ineffective as of December 31, 2020 and 2021, and MSP Recovery concluded that its internal control over financial reporting was ineffective as of June 30, 2022, because material weaknesses existed in LCAP's internal control over financial reporting and they have not been remediated to date. MSP Recovery has taken a number of measures to remediate the material weaknesses described herein; however, if it is unable to remediate its material weaknesses in a timely manner or MSP Recovery identifies additional material weaknesses, it may be unable to provide required financial information in a timely and reliable manner, and MSP Recovery may incorrectly report financial information.

MSP Recovery

As of December 31, 2021 and 2020, the Company has identified material weaknesses in its internal control over financial reporting. The material weaknesses the Company identified were as follows:

- The Company did not have sufficient accounting and financial reporting resources to address its financial reporting requirements. Specifically:
  - The Company did not have sufficient resources with an appropriate level of knowledge and GAAP expertise to identify, evaluate and account for transactions; and
  - The Company did not have an adequate segregation of duties or appropriate level of review that is needed to comply with financial reporting documents.
- The Company did not design, implement or maintain an effective control environment over our financial reporting requirements. Specifically:

     o  The Company did not have effective controls over the period end financial reporting process and preparation of financial statements due to:
- A lack of a sufficient level of formal accounting policies and procedures that define how transactions should be initiated, recorded, processed and reported; and
- A lack of an effective control environment over period end close procedures.

     o  The Company did not have appropriate controls or documented segregation of duties over information technology systems used to create or maintain financial reporting records;

     o  The Company did not design or maintain the appropriate controls related to the separation of accounting records for each entity included within the combined and consolidated financial statements of the Company.

These control deficiencies did not result in errors that were material to the Company's annual financial statements. However, these control deficiencies could result in a misstatement in MSP's accounts or disclosures that would result in a material misstatement to the annual financial statements that would not be prevented or detected. Accordingly, the Company determined that these control deficiencies constitute material weaknesses.

The Company is in the process of implementing measures designed to improve their internal control over financial reporting and remediate the control deficiencies that led to the material weaknesses. During 2022, MSP has hired key accounting personnel with appropriate levels of U.S. generally accepted accounting principles expertise and financial reporting knowledge and experience as well as has begun developing formal accounting policies and procedures, designing a control environment over how transactions are initiated, recorded, processed and reported, and implementing period end close procedures. The Company also has implemented certain accounting systems to automate manual processes, to help implement segregation of duties and to assist in consolidation and period end close. However, the Company is still in the process of addressing these deficiencies and there is no assurance that these measures will significantly improve or remediate the material weaknesses described above. The Company and their independent registered public accounting firm, were not required to perform an evaluation of the Company's internal control over financial reporting as of December 31, 2021 in accordance with the provisions of the Sarbanes-Oxley Act and as such, there is no assurance that the Company has identified all material weaknesses or that there will not be additional material weaknesses or deficiencies that are identified. While the Company's independent registered public accounting firm is not required to audit the effectiveness of our internal control over financial reporting until after the Company is no longer an "emerging growth company" as defined in the JOBS Act, a failure to design, implement or maintain effective internal control over financial reporting could adversely affect the results of annual independent registered public accounting firm audit reports regarding the effectiveness of the Company's internal control over financial reporting that the Company will eventually be required to include in reports that will be filed with the SEC. If at such time, the Company's independent

registered public accounting firm issue an audit report that is adverse due to one or more material weaknesses in the Company's internal control over financial reporting, this could have a material and adverse effect on the Company's business, results of operations and financial condition, and it could cause a decline in the trading price of the Company's Class A common stock.

111.    This statement was materially false and misleading because, even with the information above, it still understated the significant extent of the Company's material internal control weaknesses, including for the financial information presented in that very report, which would eventually lead to a government investigation.

112.    The 3Q22 Report incorporated by reference the risk disclosures from the 2Q22 Report, including the materially false and misleading statement referenced in paragraphs 87, 89, 91, 93, 95, 97, 99, 101, 103 and 105.

113.    On April 4, 2023, in response to a statement by former Cano Health Board Member Barry Sternlicht about why he was leaving Cano Health, in which he attacked MSP Recovery, Defendant Ruiz's response was recorded in a *Miami New Times* article entitled "It Should Be Gravy": Miami Magnate John Ruiz Bites Back After Cano Health Drama". The article stated, in pertinent part:

When he resigned from the Cano Health board of directors on March 30, Miami Beach billionaire Barry Sternlicht went out with a bang, skewering the company and CEO Marlow Hernandez for burning through cash and poor management, as he saw it.

\*       \*       \*

In the scathing letter, Sternlicht claimed the company's management missteps were exemplified by transactions with fellow Miami-area billionaire John Ruiz's firm MSP Recovery. It was a pointed yet cryptic jab in the direction of MSP, a company that Cano enlists for medical claims collection.

*"The number and nature of related party transactions, together with what I consider poor governance (demonstrated by transactions such as MSP Recovery), is highly concerning to me as it should be to the rest of the Board," Sternlicht wrote.*

While Sternlicht's office declined to elaborate on his comments when reached by New Times, Cano's public filings detail an arrangement in which Cano assigns claims to MSP

Recovery in exchange for cash or stock. Late last year, Cano also tested out some of MSP's healthcare data tools leading up to MSP's rebranding under its new LifeWallet moniker.

***Ruiz tells New Times he's at a loss to explain why his company was targeted in Sternlicht's barrage***.

***"I guess maybe he doesn't understand probably what we do... It should be gravy to them anyway. Because he was never at a meeting, he doesn't understand how it works. He doesn't understand the value behind it,"*** Ruiz says.

"It really doesn't cost Cano much of anything at all other than engaging us to do some data software, installing LifeWallet systems: an improvement of both the payer and the patients themselves. It's just very weird. I just think he's got a vendetta against somebody."

Ruiz adds Sternlicht's comments ***were in "poor taste."***

***"And on top of that, I think that a board member shows a lack of professionalism in conducting himself the way that he did it. [It] becomes quite obvious that there's an agenda behind the manner in which it was done."***

MSP specializes in medical claims recovery in situations where a primary insurer like an auto insurer allegedly fails to pay up for the treatment of an injured patient, putting the burden on Medicare, Medicaid, or other health plans.

***As of December 2022, MSP Recovery owed Cano roughly $60 million in receivables. The sum was due before the filing of an annual report, and MSP had the option to pay Cano in cash or stock***.

LifeWallet chief communications officer Diana Diaz says the company offered the same services to Cano as it does for other clientele, including analyzing data to identify "every recoverable instance" for medical claims.

"It was our business model... that we offer to all of our clients," Diaz tells New Times. ***"There was no difference between the Cano purchase and others that we've done for clients. We purchased the recovery rights. In this case, those recovery rights were paid in shares."***

MSP rebranded as LifeWallet in December 2022 after a difficult year in which its stock tanked upon going public, in an SPAC merger comparable to Cano's. Within a week of opening trading on the NASDAQ, the Coral Gables-based company lost more than 90 percent of its share value, shedding billions of dollars in market capitalization.

In the bid to rebrand, MSP introduced new patient-centered healthcare products and a blockchain-based tool that it said would help process claims data more efficiently.

The company also touted Ruiz's much-publicized foray into the world of collegiate sports marketing. A top funder of "name, image, and likeness" (NIL) deals for university athletes, Ruiz has enlisted multiple Miami Hurricanes players for endorsement deals with LifeWallet.

Though it had a new name, MSP maintained its core business was still medical claims recovery.

In August 2022, Cano Health announced a partnership with MSP Recovery to implement a test program slated to include facial recognition for patient check-in and tools to ensure the accuracy of patients' medical information. Three months later, MSP (rebranded as LifeWallet) described how its blockchain technology was being tested by Cano as part of a similar pilot program.

***Ruiz says he believes the MSP Recovery "transactions" Sternlicht criticized were related to claims assignments, rather than the minutia of the LifeWallet products.*** [. . .]

(Emphasis added).

114.    Defendant Ruiz's response to Barry Sternlicht's resignation from the Cano Health board and his stated grievances leading to that decision were materially false and misleading because, contrary to what he represented, Cano Health had legitimate grievances as a result of MSP Recovery's failure to pay it in full for assigned claims, which would eventually lead to a lawsuit.

115.    On April 14, 2023, the Company filed with the SEC a Current Report on Form 8-K in which it announced that its financial statements in the 2Q22 and 3Q22 Reports could no longer be relied upon. It stated the following:

On April 14, 2023, the Audit Committee of the Board of Directors (the "Audit Committee") of MSP Recovery, Inc., d/b/a LifeWallet (the "Company"), concluded that the Company's quarterly financial statements for the periods ended June 30, 2022 and September 30, 2022 require restatements and should no longer be relied upon. In addition, any previously issued or filed earnings releases, investor presentations or other communications describing the Company's quarterly financial statements and other related financial information covering the quarters ended June 30, 2022 and September 30, 2022 should no longer be relied upon.

In connection with the preparation of the Company's audited financial statements for the year ended December 31, 2022, the Company identified errors in the accounting for the indemnification asset, various intangible assets and rights to cash flows and consolidation of an entity in connection with the Company's business combination. The Company used in the valuation of certain assets acquired in connection with the business combination the market price of the Company's Class A common stock based on the closing price immediately preceding the business combination, which instead should have been based on the opening price of the Company's Class A common stock after the closing of the Company's business combination. In addition, the Company determined that rights to receive the distributable net proceeds from certain claims should have been consolidated into the Company's financial statements. In connection with these restatements, the Company also identified material weaknesses in internal controls related to the accounting for complex transactions.

The Company will include restated financial information for the affected periods in a footnote to the financial statements included in the Company's Annual Report on Form 10-K for the fiscal year ended December 31, 2022, as well as in future Quarterly Reports or Form 10-Q. The Company has not filed and does not intend to file an amendment to the Company's previously filed Quarterly Reports on Form 10-Q for the affected periods.

The Company's management and the Audit Committee have discussed the matters disclosed in this Current Report on Form 8-K pursuant to this Item 4.02 with Deloitte & Touche LLP, the Company's independent registered public accounting firm.

116.    This statement was materially false and misleading because while it admitted that the Company's financial results would need to be restated, it understated the Company's problems, which led to a government investigation.

117.    On July 27, 2023, the Company filed with the SEC its annual report on Form 10-K for the period ended December 31, 2022 (the "2022 Annual Report"). Attached to the 2022 Annual Report were certifications pursuant to SOX signed by defendants Ruiz and Rivera attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting, and the disclosure of all fraud.

118.    In the 2022 Annual Report, the Company stated the following as a risk:

***We are subject to extensive government regulation. Any violation of the laws and regulations applicable to us or a negative audit or investigation finding could have a material adverse effect on our business.***

Much of our business is regulated by the Federal Government and the states in which we operate. The laws and regulations governing our operations generally are intended to benefit and protect individual citizens, including government program beneficiaries, health plan members and providers, rather than stockholders. The government agencies administering these laws and regulations have broad latitude to enforce them. These laws and regulations regulate how we do business, what services we offer and how we interact with our Assignors, providers, other healthcare payers and the public. Increased involvement by us in analytic or audit work that can have an impact on the eligibility of individuals for medical coverage or specific benefits could increase the likelihood and incidence of us being subjected to scrutiny or legal actions by parties other than our Assignors, based on alleged mistakes or deficiencies in our work, with significant resulting costs and strain on our resources.

<div align="center">*        *        *</div>

The expansion of our operations into new products and services may further expose us to requirements and potential liabilities under additional statutes and legislative schemes that previously have not been relevant to our business, such as banking statutes, that may both increase demands on our resources for compliance activities and subject us to potential penalties for noncompliance with statutory and regulatory standards.

***If the government discovers improper or illegal activities in the course of audits or investigations, we may be subject to various civil and criminal penalties and administrative sanctions, which may include termination of contracts, forfeiture of profits, suspension of payments, fines and suspensions and debarment from doing business with the government***. Such risks, particularly under the Federal False Claims Act and similar state fraud statutes, have increased in recent years due to legislative changes that have (among other amendments) expanded the definition of a false claim to include, potentially, any unreimbursed overpayment received from, or other monetary debt owed to, a government agency. If we are found to be in violation of any applicable law or regulation, or if we receive an adverse review, audit or investigation, any resulting negative publicity, penalties or sanctions could have an adverse effect on our reputation in the industry, impair our ability to compete for new contracts and have a material adverse effect on our business, financial condition and results of operations.

We are also subject to laws, regulations and rules enacted by national, regional and local governments and Nasdaq. In particular, we are required to comply with certain SEC, Nasdaq and other legal or regulatory requirements. Compliance with, and monitoring of, applicable laws, regulations and rules may be difficult, time-consuming and costly. Those laws, regulations or rules and their interpretation and application may also change from time to time and those changes could have a material adverse effect on our business, investments and results of operations. In addition, a failure to comply with applicable laws, regulations or rules, as interpreted and applied, could have a material adverse effect on our business and results of operations.

(Emphasis added)

119.    This statement was materially false and misleading because it discussed hypothetical violations or investigations when, by the time it was made, the Company had been informed that it was under investigation by the Securities & Exchange Commission and had received a subpoena by the United States District Attorney's Office in connection with a grand jury investigation in the U.S. District Court for the Southern District of Florida, and Company materials had been subpoenaed.

120.    The 2022 Annual Report contained the following disclosure on the Company's history:

> ***We have a history of net losses and no substantial revenue to date, and we may not achieve recoveries, generate significant revenue, or achieve profitability. Our relatively limited operating history makes it difficult to evaluate our current business and future prospects and increases the risk of your investment.***
>
> Our relatively limited operating history makes it difficult to evaluate our current business and plan for our future growth. The Company started in 2014 with its very first assignment from a health plan in Miami, Florida. To date, we have achieved no substantial revenue and limited actual recoveries from our assigned Claims, and there is no guarantee that we will achieve recoveries, revenue, or profitability as we have projected. We have encountered and will continue to encounter significant risks and uncertainties frequently experienced by new and growing companies in rapidly changing industries, such as determining appropriate investments for our limited resources, competition from other data analytics companies, ***acquiring and retaining Assignors,*** hiring, integrating, training and retaining skilled personnel, unforeseen expenses, challenges in forecasting accuracy and successfully integrating new strategies. If we are unable to achieve actual recoveries, ***increase our Assignor base***, successfully manage our recovery efforts from third-party payers or successfully expand, our revenue and our ability to achieve and sustain profitability would be impaired. If our assumptions regarding these and other similar risks and uncertainties, which we use to plan our business, are incorrect or change as we gain more experience operating our business or due to changes in our industry, or if we do not address these challenges successfully, our operating and financial results could differ materially from our expectations and our business could suffer.

121.    This statement was materially false and misleading because it did not disclose that it was at a heightened risk of not being able to acquire or retain assignors as a result of

being able to pay existing assignors. By the time this statement was made, the Company had even resorted to delaying by months the filings of its reports with the SEC, including the 2022 Annual Report, and using that as an excuse to not pay its assignors.

122.    The 2022 Annual Report contained the following disclosure on assignors pursuing recovery directly or, alternatively, using other recovery agents:

> ***Assignors may pursue recovery on Claims directly or may use recovery agents other than us in connection with the Assignor's efforts to recover on Claims.***
>
> With respect to the Assignors of the assigned Claims, some of our agreements exclude from the assignment of Claims those Claims that are assigned to or being pursued by other recovery vendors of the Assignor at the time of the assignment. We have identified instances where the Assignor did not filter its data provided to us to account for such exclusions. This resulted in some Claims being identified by us for purposes of our recovery estimates. This also has resulted in other recovery agents of the Assignor making collections on Claims that we previously believed were assigned to us. Although we endeavor to seek appropriate clarification from Assignors to properly identify Claims that are being pursued by other recovery vendors, due to the nature and volume of data, it may not be possible to identify with precision all such Claims. While we do not believe that there is any overlap with other recovery vendors with respect to assigned Claims to be material, there can be no assurance as to the ultimate impact on our recoveries or our business.

123.    This statement was materially false and misleading at the time it was made because it omitted that Assignors might, as a result of issues such as the Company's failure to pay for existing assigned claims (and even delaying the filing of forms with the SEC to avoid having to pay for assigned claims) opt to use other recovery agents in the future or pursue claims themselves.

124.    The 2022 Annual Report contained this claim on its future growth:

> ***Our business and future growth depend on our ability to successfully expand the volume of our healthcare Claims and obtain data from new Assignors and healthcare Claims from our existing Assignor base.***
>
> We expect a significant portion of our future revenue growth to come from expanding the volume of Claims we are assigned; this includes obtaining Claims and data from new Assignors as well as our existing Assignors. Our efforts to do so may not be successful.

If we are unable to successfully expand the scope of healthcare Claims assigned from potential and existing Assignors, it could have a material adverse effect on our growth and on our business, financial condition, and results of operations.

125.    This statement was materially false and misleading because, by the time it was made, the Company was resorting to extreme measures such as failing to file reports on forms 10-Q and 10-K with the SEC in order to avoid paying assignors of claims.

126.    The 2022 Annual Report contained this disclosure on the termination of agreements with Assignors, and on breach of agreements:

*If our existing Assignors prematurely terminate their agreement with us or if either party materially breaches an agreement, and we can no longer receive future assignments of healthcare Claims recoveries, it could have a material adverse effect on our business, financial condition, and results of operations.*

We expect in the future to derive a significant portion of our revenue from our existing Assignors and, accordingly, we are reliant on ongoing transfer and usage of data, and associated assignments, of Claims from existing Assignors. As a result, maintaining these relationships is critical to our future growth and our business, financial condition and results of operations. We may experience significantly more difficulty than we anticipate in maintaining our existing Assignor agreements. Factors that may affect our ability to continue providing our services under such agreements for our services and our ability to sell additional solutions include:
- the price, performance, and functionality of our solutions;
- the availability, price, performance, and functionality of competing solutions;
- our Assignors' perceived ability to review Claims accurately using their internal resources;
- our ability to develop complementary solutions;
- our continued ability to access the data necessary to enable us to effectively develop and deliver new solutions to Assignors;
- the stability and security of our platform;
- changes in healthcare laws, regulations, or trends; and
- the business environment of our Assignors.

Pursuant to the Claims recovery and assignment agreements with our Assignors, the Assignors may choose to discontinue one or more services under an existing contract, may exercise flexibilities within their contracts to adjust service volumes, and may breach or terminate the contract prior to its agreed upon completion date. A material breach by either party to the agreement may also result in the termination of receiving future Claims. Any such occurrences could reduce our revenue from these Assignors. Although a cancellation or termination of a contract does not revoke the original assignment from our Assignors in many instances because such assignment was

46

irrevocable, termination still affects future transfers of data and future assignment of Claims. Accordingly, such cancellations or terminations can constrain our growth and result in a decrease in revenue, which could have a material adverse effect on our business, financial condition and results of operations.

127.    This statement was materially false and misleading because, at the time it was made, there was a heightened risk of assignors prematurely terminating agreements with the Company as a result of its failure to pay for claims.

128.    The 2022 Annual Report contained the following section on data access in the event of the termination of an agreement:

> *If an Assignor prematurely terminates its agreement with us, we may be precluded from accessing that Assignor's data and/or be forced to destroy data in our position from that Assignor, which may substantially impair our ability to recover on that Assignor's Claims.*
>
> We enter into Claims Cost Recovery Agreements ("CCRA") and Business Associate Agreements ("BAA") with our Assignors. Pursuant to the CCRAs with our Assignors, our Assignors typically agree to provide the Company with historical claims data as well as the most updated claims data that the Assignor's systems can provide and provide ongoing data transfers and agreed upon intervals. If, for any reason, our CCRA with an Assignor is terminated, our BAA with that Assignor requires us to return and/or destroy all Protected Health Information, which may substantially impair our ability to recover on that Assignor's Claims.

129.    This statement was false and misleading because, by the time it was made, the Company was unable to pay for its existing claims, raising the likelihood of the termination of an agreement and, as such, raising the likelihood that the Company wouldn't be able to access data needed to recover on a claim.

130.    The 2022 Annual Report contained the following risk disclosure on developing new assignor relationships:

> *If we are unable to develop new Assignor relationships, it could have a material adverse effect on our business, financial condition, and results of operations.*
>
> As part of our strategy, we seek to develop new Assignor relationships, principally among healthcare payers and providers. Our ability to develop new relationships

depends on a variety of factors, including the quality and performance of our solutions, as well as the ability to market and sell our solutions effectively and differentiate ourselves from our competitors. We may not be successful in developing new Assignor relationships. If we are unable to develop new Assignor relationships, it could have a material adverse effect on our business, financial condition, and results of operations.

131.    This statement was materially false and misleading because, by the time it was made, there was a heightened risk of the Company being unable to develop new assignor relationships as a result of it being unable to pay existing assignors of claims, which could lead to reputational damage if an existing assignor decided to resort to litigation to recover unpaid funds, which happened just a few weeks after the filing of the 2022 Annual Report,

132.    The 2022 Annual Report contained the following disclosure on concentration of assignor risk:

> ***A significant portion of our Claims comes from a limited number of Assignors who have relationships with key existing payers, and the loss of one or more of these Assignors or disruptions in Assignor-payer relationships could have a material adverse effect on our business, financial condition and results of operations.***
>
> We have acquired a significant portion of our Claims from and entered into agreements for new services with a limited number of large Assignors. These Assignors assign these Claims with an irrevocable assignment from the Assignor to us each with different and/or staggered terms. In addition, we also rely on our reputation and recommendations from key Assignors to promote our solutions to potential new Assignors.
>
> Further, our ability to pursue a significant portion of our Claims depends on our arrangements pursuant to which we are granted access to health care data, which may be terminated upon the occurrence of certain events. See "- We use various data sources in our business and if we lose access to those data sources it could have a material adverse effect on our business, financial condition, and results of operations." Accordingly, if any of these Assignors fail to renew or terminate their existing agreements with us, it could have a material adverse effect on our business, financial condition and results of operations.

133.    This statement was materially false and misleading at the time it was made because the Company was in breach of its agreement with Cano Health, and had even resorted to delaying its filing of the 2022 Annual Report in order to avoid paying Cano Health. As a

result, it was at substantial litigation risk relating to Cano Health, an important assignor, and was also at a high level of reputational risk.

134.    The 2022 Annual Report contained the following disclosure on competition:

***We face significant competition, and we expect competition to increase.***

Competition among providers of healthcare payment accuracy solutions to U.S. healthcare insurance companies is strong and we may encounter additional competition as new competitors enter this area.

Our current healthcare solutions competitors include:

- other payment accuracy vendors, including vendors focused on discrete aspects of the healthcare payment accuracy process;
- fraud, waste, and abuse Claim edit and predictive analysis companies;
- primary Claims processors;
- in-house payment accuracy capabilities;
- Medicare RACs; and
- Healthcare consulting firms and other third-party liability service providers.

***We may not be able to compete successfully against existing or new competitors. In addition, we may be forced to increase the consideration we provide for assigned Claims or lower our pricing, or the demand for our data-driven solutions may decrease as a result of increased competition. Further, a failure to be responsive to our existing and potential Assignors' needs could hinder our ability to maintain or expand our Assignor base, hire and retain new employees, pursue new business opportunities, complete future acquisitions and operate our business effectively***. Any inability to compete effectively could have a material adverse effect on our business, financial condition and results of operations.

(Emphasis added).

135.    This statement was materially false and misleading because, at the time it was made, the Company could not afford to pay increased consideration for assigned claims. By the time that statement was made, the Company had even resorted to delaying its filing of annual and quarterly reports with the SEC to then use its purported inability to file as an excuse to not pay assignors of claims. Further, it had already failed to be responsive to the needs of Cano

Health, a major existing assignor, leading to Cano suing it mere weeks after this statement was issued.

136.    The statements contained in ¶¶ 34, 36, 38, 40, 42, 44, 46, 48, 50, 52, 54, 56, 58-60, 62, 64, 66, 68, 70, 72, 74, 76, 78, 80, 82-83, 87, 89, 91, 93, 95, 97, 99, 101, 103, 105, 107, 108, 110, 112, 114-15, 117-18, 120, 122, 124, 126, 128, 130, 132, and 134 were materially false and/or misleading because they misrepresented and failed to disclose the following adverse facts pertaining to the Company's business, operations and prospects, which were known to Defendants or recklessly disregarded by them. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (1); MSP Recovery did not disclose that it was under active investigation by the SEC and federal prosecutors; (2) certain financial information given to investors by MSP Recovery was materially false and misleading; (3) MSP Recovery did not fully disclose the extent of its issues when it admitted that its financial results would need to be restated; (4) MSP Recovery was unable to afford the assigned claims on which it depends, and defrauded a major healthcare provider that sold or assigned it its claims, (5) The Registration Statement contained various false or misleading statements and was negligently prepared; (6) The Proxy contained false or misleading statements; and (7) as a result, Defendants' statements about its business, operations, and prospects, were materially false and misleading and/or lacked a reasonable basis at all relevant times and/or were negligently prepared.

## **THE TRUTH BEGINS TO EMERGE**

137.    On July 31, 2023, *The Miami Herald* released an article entitled 'Red flags on top of red flags': Problems mount for UM athletics booster John Ruiz", about Defendant Ruiz. The article stated, in pertinent part:

Even by Miami standards, John H. Ruiz has been living large.

He doesn't buy just one waterfront mansion. He buys seven.

He doesn't just buy a 20-seat private plane. He buys a private Boeing passenger jet.

And he doesn't stop at buying fancy speed boats. He buys the companies that make them.
The brash attorney and entrepreneur has also become known as the sugar daddy of the University of Miami athletic program, making headlines for his company's sponsorship of star players and bold proposals to build the university a new football stadium.

But the high living might soon be coming to an end.

***The Miami Herald has learned that Ruiz and his health insurance claims company LifeWallet — previously known as MSP Recovery — are the target of federal civil and criminal investigations***. The ongoing federal probes mark an unprecedented level of trouble for the one-time TV host whose business practices and out-sized lifestyle evoke comparisons to Donald Trump.

His teetering enterprise is built on a Coral Gables company that seeks to recover money paid by Medicare-affiliated insurance companies that should have been paid by a different insurance carrier.

LifeWallet was once valued at more than $32 billion, but the company is now worth a small fraction of that. Its stock, which was worth more than $10 a share right before the company went public through a special purpose acquisition company, or SPAC, merger last year now trades for less than a quarter. Ruiz and the company are also facing several lawsuits claiming that they owe millions of dollars to the sellers of businesses they acquired.

Ruiz has weathered trouble before — he was given a public reprimand by the Florida Bar in 2011 over a legal dispute — and his Coral Gables home, an office building he owned and even his boat were all the subject of foreclosure actions a decade ago.

But his current problems are more serious.

Ruiz and LifeWallet are the target of investigations by the U.S. Securities and Exchange Commission and the U.S. Attorney's Office for the Southern District of Florida.

The SEC declined to officially comment on whether it is investigating Ruiz's company. But the regulatory agency indicated that MSP Recovery, doing business as LifeWallet, is currently under federal investigation in response to a Freedom of

Information Act request from the Miami Herald. The SEC said it could not turn over records requested by the Herald because they had been "compiled for law enforcement purposes" and could "reasonably be expected to interfere with enforcement activities." *Sources familiar with the probe say SEC investigators are looking at what Ruiz's company represented to investors about its value and other possible securities violations.*

*The Herald has also learned that multiple witnesses have been interviewed about Ruiz and his company by the U.S. Attorney's Office in Miami. The investigation, led by FBI and IRS agents, is looking at financial representations made to investors and spending practices, according to sources. All three agencies declined to comment.*

\*        \*        \*

**CASH CONCERNS**

It can sometimes be hard to distinguish spending by Ruiz and his health-claims company.

Take the example of private jets.

A month before LifeWallet went public in 2022, Ruiz invited Miami reporters to tour his new private jet, a Boeing 767 that had once ferried passengers for the Australian airline Qantas.

The refurbished interior now included a theater, bedroom and shower, conference room, dining room and two lounges with couches that converted to beds, according to the Miami New Times.

A company called MSP Recovery Aviation, LLC registered the plane with the Federal Aviation Administration a month before MSP Recovery announced that it would go public the following year. But Ruiz said that he is, in fact, the owner of the planes. LifeWallet pays Ruiz's company for use of the planes, according to the Company's financial filings.

MSP Recovery Aviation, LLC first [bought] two private jets in 2018 and currently owns three planes, including the Boeing jet, and a helicopter. Ruiz said that his company is currently trying to sell the Boeing plane and the helicopter.

Ruiz's spending spree in recent years has been all the more striking given his financial condition not long ago.

He had been facing foreclosure on a Coral Gables home and his boat and lost an office building. He and his then-wife Mayra were subject to a 2014 tax lien from the Internal Revenue Services for nearly $30,000 in unpaid federal taxes from 2011 and 2013. And his ill-fated attempt to turn an old baseball stadium in

Homestead into a youth sports mecca failed publicly. Ruiz's company wound up being evicted from the stadium, on the losing end of a lawsuit against the city and the subject of embarrassing stories about the shoddy living conditions of Venezuelan teenagers who had been living in the stadium through a baseball training program leasing space from Ruiz's company.

Even as his spending surged, Ruiz seemed to regularly find himself in need of more cash.

While he and his connected companies appeared to pay for most of the properties up-front with cash, he subsequently wound up using many of the properties as collateral for more than $80 million in loans taken out in 2021 and 2022, according to Miami-Dade property records. The most recent homes he sold in the Gables Estates went for millions less than he had initially asked for them — with one selling for two-thirds the original asking price. Ruiz told the Herald he "often acquires real estate through all- cash purchases and occasionally uses the equity in one property to obtain financing for the purchase of other properties."

In the wake of LifeWallet's decline, numerous business owners have come forward saying they are owed millions by the company and Ruiz.

Ruiz agreed to buy Titusville, Florida boat manufacturer Vectorworks for $35 million in cash in late 2021, but to date has paid only $15 million, according to a lawsuit that is ongoing. Ruiz said he was persuaded to buy the company under "materially false pretenses."

And Norberto Menendez, the founder of the company that gave Ruiz's health-claims company its name, LifeWallet, said in a lawsuit that he is owed $12.5 million.

In text messages from August 2022 produced in the suit, Ruiz indicates that the amount was to be paid in a pre-set amount of company stock that was worth less at that point and is practically worthless now.

"The market is down but will adjust at some point," Ruiz wrote in August 2022, arguing that Menendez should accept shares as payment. "Again the only reason we are discussing this is bc the stock market is down."

Menendez insists it was to be cash or a cash-equivalent. Ruiz denies all the allegations in the lawsuit and the case is ongoing.

(Emphasis added.)

138.    On this news, the price of MSP Recovery stock fell $0.0127 per share, or 5.89%, to close at $0.2028 on July 31, 2023.

139.    Then, on August 1, 2023, after hours, the Company filed with the SEC a current report on Form 8-K which confirmed the Miami Herald's allegation that the Company was under investigation. It stated:

On August 11, 2022, the Securities and Exchange Commission (the "SEC") initiated an investigation of the Company, and requested documents relating to, among other matters, the business combination transaction with Lionheart Acquisition Corporation II consummated on May 23, 2022 and related matters. ***The Company received a subpoena dated March 1, 2023 from the SEC regarding the aforementioned subject matter, and subsequently received a subpoena on May 10, 2023 requesting documents in connection with the Company's financial statements for the periods ended June 30, 2022 and September 30, 2022 that required restatements as disclosed in the Company's Form 8-K filed with the SEC on April 14, 2023***.

In addition, on March 10, 2023, the Company received a subpoena from the U.S. Attorney's Office in connection with a grand jury investigation in the U.S. District Court for the Southern District of Florida requesting certain information concerning the Company. To the best of the Company's knowledge, the Department of Justice has not issued any target letters to anyone associated with the Company as a result of this investigation. (The United States Attorney's Manual states that a "target" is a person as to whom the prosecutor or the grand jury has substantial evidence linking him or her to the commission of a crime and who, in the judgment of the prosecutor, is a putative defendant.)

The Company has cooperated, and will continue to cooperate, fully with these inquiries. In connection with its review of the matters related to the preparation and filing of the Company's Annual Report on Form 10-K for the year ended December 31, 2022, a special committee of the Company's board of directors, along with external advisors retained thereby, also reviewed the subject matter of information requests related to the foregoing subpoenas.   Based on this review, the Company believes that these investigations will be resolved without any material developments; however, there can be no assurance as to the outcome or future direction thereof.

(Emphasis added).

140.    On this news, the price of MSP Recovery stock fell $0.025 per share, or 12.19%, to close at $0.18 on August 2, 2023.

141.    Then, on August 10, 2023, after market hours, Cano sued the Company, related entities, as well as Defendant Ruiz in Florida state court, seeking nearly $67 million.

142.    In the lawsuit itself, Cano alleged that the Company "is a sham. MSP Recovery has never been able to secure any meaningful revenue from the claims it has aggregated. Instead, it used the face value of those claims to prop up an absurdly over-inflated valuation, and that leveraged false valuation to (i) fraudulently induce business partners to give up valuable assets in return for worthless shares and rights to future shares in MSP Recovery, and (ii) support windfall salaries and perks for its executive officers, including many self-interested transactions with its own founder and CEO, Defendant John Ruiz."

143.    Further, Cano alleged the following:

Between 2021 and 2022, before this fraud came to light, Defendants fraudulently induced Cano Health to assign them claims with a face value of as much as several **billion** dollars. Cano Health did so in reliance upon fraudulent, unrealized promises by Defendants that they would pay Cano Health consideration of at least $66.75 million in the form of either cash or an issuance of securities. Defendants specifically represented that if they used securities to pay their debts to Cano Health--which of course they did because, unbeknownst to Cano Health, Defendants' business was generating no income—then they would take all necessary steps to **ensure** those securities were registered within ten business days of issuance, and furthermore to make "true up" payments in cash or additional shares to Cano Health if those securities failed to maintain their market value.

But the deadlines for payment and registration have come and gone, and Defendants have materially breached their obligations to Cano Health by either (i) failing to attempt payment *at all*, or otherwise (ii) failing to register the securities issued to Cano Health, meaning Cano Health has given up a fortune in potential claims and received nothing in return but worthless, unsellable shares in a sham company. Unsurprisingly, recent news reporting has disclosed that Defendants are the subject of criminal and civil investigations by (i) the U.S. Attorney's Office for the Southern District of Florida, (ii) the Federal Bureau of Investigation, (iii) the Securities and Exchange Commission, and (iv) the Internal Revenue Service, and Defendants are also the defendants in numerous private lawsuits seeking to recover for unpaid debts and other misconduct.
(Emphasis in original)

144.    In particular, the lawsuit alleged that MSP Recovery has failed to timely file documents with the SEC, including its 2022 Annual Report, in order to conceal that the Company is a fraud. Further, the lawsuit revealed that MSP Recovery has used its failure to file

the 2022 Annual Report as an excuse to not fulfill its contractual obligations to pay Cano for the

claims that Cano assigned to MSP Recovery. The complaint stated in pertinent part:

> On June 29, 2023 and July 7, 2023, MSP Recovery issued a combined 200,000,001 shares of stock to Cano Health, as the first of several steps necessary to satisfy its payment obligations under the Claims Agreement and Purchase Agreement. A public filing memorializing these issuances of shares is attached [. . .].
>
> Under the relevant terms of the Claims Agreement and Purchase Agreement, Defendants were then required to ***"ensure that [MSP Recovery makes all appropriate filings to register the LIFW Shares" by no later than <u>June 30, 2023</u>, as to the shares issued for the Assigned Past Claims, and <u>July 21, 2023</u>, as to all others.*** *See* Claims Agreement (UNDER SEAL) §§ 3.1-3.3; First Claims Amendment (UNDER SEAL) § 1; Second Claims Amendment (UNDER SEAL) § 1; Purchase Agreement §§ 1.1a; First Purchase Amendment §1.
>
> But MSP Recovery did not register the shares issued to Cano Health by those deadlines. Instead, MSP Recovery sent a letter to Cano Health on July 21, 2023, explaining that because MSP Recovery sill had not filed its Form 10-K for the year 2022, nor other periodic reports that were overdue, it was unable to register the shares. A Copy of this letter is attached hereto as Exhibit 13.
>
> MSP Recovery therefore admitted that [d]efendants had materially breached their contractual obligations to "ensure that [MSP Recovery] makes all appropriate filings to register the LIFW Shares" by no later than June 30, 2023, and July 21, 2023.
>
> MSP Recovery's failure to make timely filings with the SEC also constituted a material breach of Defendants' contractual obligations to use "commercially reasonable best efforts to cause the [necessary] filings to become effective, and the shares to become fully registered, unrestricted, and freely tradeable, ***as soon as possible***." To state the obvious, a commercially reasonable entity would file its mandatory periodic reports with the SEC—especially its *first ever* annual report—in a timely fashion, and certainly not miss the deadline to do so by more than three months.
>
> (Emphasis in original).

145.   Exhibit 13 to Cano's complaint contained a July 21, 2023 letter from Alexandra

Plasencia, General Counsel of MSP Recovery, which was addressed to Cano Health LLC. It

confirmed that MSP Recovery has used its repeated failure to file its 2022 Annual 10-K as an

excuse to not pay Cano. It stated, in pertinent part:

I am writing to provide an update regarding the registration status of shares we recently issued to Cano Health, LLC. On July 7, 2023, [MSP] issued 199,000,001 Class A common shares (the "Issued Shares") of the Company pursuant to the: (i) Claims Recovery and Assignment Agreement dated January 19, 2021, as amended; and (ii) Purchase Agreement dated September 30, 2022, as amended (collectively, the "Agreements"), in satisfaction of payment obligations[.]

The Agreements state that the Company will ensure all appropriate filings to register the Issued Shares are made within ten business days of issuance and use commercially reasonable best efforts to cause such filings to become effective, and the shares to become fully registered, unrestricted, and freely tradeable, as soon as possible.

*As you are aware, the Company has not yet filed its 2022 Form 10-K and Q1-2023 Form 10-Q. These periodic reports must be filed with the SEC before the Company can initially file a resale registration statement covering the Issued Shares.* We are working diligently to finalize and file our periodic reports. Once our periodic reporting is current, we will file a Form S-1 Registration Statement to register the resale of the Issued Shares and use commercially reasonable best efforts to cause the registration to become effective. We will keep you apprised of any developments.

(Emphasis added).

146.    On this news, the price of MSP recovery stock fell by $0.0271 cents per share, or 18.42%, to close at $0.12 on August 11, 2023.

147.    On August 17, 2023, after the market closed, the Company filed with the SEC its quarterly report on Form 10-Q for the period ended March 31, 2023 (the "1Q23 Report"). Attached to the 1Q23 Report were certifications pursuant to SOX signed by defendants Ruiz and Rivera attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting, and the disclosure of all fraud.

148.    The 1Q23 Report disclosed the following:

On August 16, 2023, the Company received an additional subpoena from the SEC regarding certain funding sources of the Company prior to the Business Combination, as well as various statements and disclosures by the Company in connection with and following the Business Combination.  The Company intends to fully cooperate with such subpoena, as it has with the aforementioned investigations.

149.    Also on August 17, 2023, the Company filed with the SEC a Current Report on Form 8-K in which it disclosed that it had received a notification letter from Nasdaq's Listing

Qualifications Department, which stated that the Company wasn't in compliance with Nasdaq's Rule 5250(c)(1) as a result of not having timely filed its Form 10-Q for the period ended June 30, 2023.

150.    On this news, the price of the Company's stock fell by 0.0031, or 2.67%, to close at $0.1129 on August 18, 2023. The next day, the stock fell a further $0.0186, or 16.47%, to close at $0.0943 on August 19, 2023.

151.    As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's common shares, Plaintiff and other Class members have suffered significant losses and damages.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

152.    Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who: (1) purchased or otherwise acquired the publicly traded securities of the Company during the Class Period; (2) all persons or entities who held common stock of Lionheart on May 18, 2022 eligible to vote at Lionheart's May 18, 2022 special meeting and were damaged upon the revelation of the alleged corrective disclosure, or (3) purchased MSP securities pursuant and/or traceable to the Registration Statement (the "Class"). Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

153.    The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, MSP Recovery securities were actively traded on NASDAQ. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds, if not thousands of members in the proposed Class.

154.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

155.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

156.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the Securities Act or the Exchange Act was violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business and financial condition of MSP Recovery;

- whether Defendants' public statements to the investing public during the Class Period omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

- whether the Defendants caused MSP Recovery to issue false and misleading filings during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false filings;

- whether the Registration Statement contained false or misleading statements of material fact and omitted material information required to be stated therein;

- whether the prices of MSP Recovery securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

157.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

158.    Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- MSP Recovery shares met the requirements for listing, and were listed and actively traded on NASDAQ, an efficient market;

- As a public issuer, MSP Recovery filed periodic public reports;

- MSP Recovery regularly communicated with public investors via established market communication mechanisms, including through the regular dissemination of press releases via major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

- MSP Recovery's securities were liquid and traded with moderate to heavy volume during the Class Period; and

- MSP Recovery was followed by a number of securities analysts employed by major brokerage firms who wrote reports that were widely distributed and publicly available.

159.    Based on the foregoing, the market for MSP Recovery securities promptly digested current information regarding MSP Recovery from all publicly available sources and reflected such information in the prices of the shares, and Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

160.    Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information as detailed above.

### COUNT I
#### For Violations of Section 10(b) And Rule 10b-5 Promulgated Thereunder
#### Against the 10(b) Defendants

161.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

162.    This Count is asserted against Defendants is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

163.    During the Class Period, Defendants, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

164.    Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

- employed devices, schemes and artifices to defraud;

- made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

- engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of MSP Recovery securities during the Class Period.

165.    Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of MSP Recovery were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws. These defendants by virtue of their receipt of information reflecting the true facts of MSP Recovery, their control over, and/or receipt and/or modification of MSP Recovery's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning MSP Recovery, participated in the fraudulent scheme alleged herein.

166.    The 10(b) Defendants, who are the senior officers and/or directors of the Company, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Plaintiff and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or other MSP Recovery personnel to members of the investing public, including Plaintiff and the Class.

167.    As a result of the foregoing, the market price of MSP Recovery securities was artificially inflated during the Class Period. In ignorance of the falsity of Defendants' statements, Plaintiff and the other members of the Class relied on the statements described above and/or the integrity of the market price of MSP Recovery securities during the Class Period in purchasing MSP Recovery securities at prices that were artificially inflated as a result of Defendants' false and misleading statements.

168.    Had Plaintiff and the other members of the Class been aware that the market price of MSP Recovery securities had been artificially and falsely inflated by Defendants' misleading statements and by the material adverse information which Defendants did not disclose, they would not have purchased MSP Recovery securities at the artificially inflated prices that they did, or at all.

169.    As a result of the wrongful conduct alleged herein, Plaintiff and other members of the Class have suffered damages in an amount to be established at trial.

170.    By reason of the foregoing, Defendants have violated Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder and are liable to the plaintiff and the other members of the Class for substantial damages which they suffered in connection with their purchase of MSP Recovery securities during the Class Period.

### COUNT II
**Violations of Section 20(a) of the Exchange Act**
**Against the 10(b) Defendants RE: Violations of Section 10(b) And Rule 10b-5**

171.    Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

172.    During the Class Period, the Individual Defendants participated in the operation and management of MSP Recovery, and conducted and participated, directly and indirectly, in

the conduct of MSP Recovery's business affairs. Because of their senior positions, they knew the adverse non-public information about MSP Recovery's false financial statements.

173.    As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to MSP Recovery's financial condition and results of operations, and to correct promptly any public statements issued by MSP Recovery which had become materially false or misleading.

174.    Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which MSP Recovery disseminated in the marketplace during the Class Period concerning MSP Recovery's results of operations. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause MSP Recovery to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of MSP Recovery within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of MSP Recovery securities.

175.    By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by MSP Recovery.

<u>**COUNT III**</u>
**Violation of Section 14(a) of the Exchange Act and Rule 14a-9**
**Against The Director Defendants**

176.    Plaintiff incorporates by reference and realleges each and every allegation contained above as though fully set forth herein, except any allegation of fraud, recklessness, or intentional misconduct.

177.     This Count does not sound in fraud. Plaintiff does not allege that the Director Defendants had scienter or fraudulent intent with respect to this Count as they are not elements of a Section 14(a) claim.

178.     SEC Rule 14a-9, 17 C.F.R. § 240.14a-9, promulgated pursuant to Section 14(a) of the Exchange Act, provides:

> No solicitation subject to this regulation shall be made by means of any proxy statement, form of proxy, notice of meeting or other communication, written or oral, containing any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading.

179.     The Director Defendants prepared and disseminated the false and misleading Proxy specified above, which failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading in violation of Section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder.

180.     By virtue of their positions within Lionheart and their due diligence regarding the Merger, the Director Defendants were aware of this information and of their duty to disclose this information in the Proxy. The Proxy was prepared, reviewed, and/or disseminated by the Defendants named herein. The Proxy misrepresented and/or omitted material facts, as detailed above. Defendants were at least negligent in filing the Proxy with these materially false and misleading statements.

181.     As stated herein, the Proxy contained untrue statements of material fact and omitted to state material facts necessary to make the statements made not misleading in violation of Section 14(a) of the Exchange Act and SEC Rule 14a-9 promulgated thereunder. The Proxy was an essential link in the consummation of the Merger. The Director Defendants also failed to correct the Proxy prior to the Merger and the failure to update and correct false statements is also a violation of Section 14(a) of the Exchange Act and SEC Rule 14a-9 promulgated thereunder.

182.     As a direct result of the Director Defendants' negligent preparation, review and dissemination of the false and/or misleading Proxy, Plaintiff and the Class were precluded from exercising their right to seek redemption of their Lionheart shares prior to the Merger on a fully informed basis and were induced to vote their shares and accept inadequate consideration in connection with the Merger. The false and misleading Proxy used to obtain shareholder approval of the Merger deprived Plaintiff and the Class of their right to a fully informed shareholder vote in connection therewith and the full and fair value for their Lionheart shares. At all times relevant to the dissemination of the materially false and/or misleading Proxy, the Director Defendants were aware of and/or had access to the true facts concerning the true value of Legacy MSP, which was far below the operational assets that shareholders received. Thus, as a direct and proximate result of the dissemination of the false and misleading Proxy that the Director Defendants used to obtain shareholder approval of and thereby consummate the Merger, Plaintiff and the Class have suffered damages and actual economic losses in an amount to be determined at trial.

183.     The omissions and false and misleading statements in the Proxy were material in that a reasonable stockholder would have considered them important in deciding how to vote on the Merger. In addition, a reasonable investor would view a full and accurate disclosure as significantly altering the "total mix" of information made available in the Proxy and in other information reasonably available to stockholders.

184.     By reason of the foregoing, Defendants have violated Section 14(a) of the Exchange Act and Rule 14a-9(a) promulgated thereunder.

**COUNT IV**
**Violation of Section 20(a) of the Exchange Act of 1934**
**Against the Director Defendants**

185.     Plaintiff incorporates and repeats each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

186.     The Director Defendants acted as controlling persons of Lionheart within the meaning of Section 20(a) of the Exchange Act, as alleged herein. By virtue of their positions as officers and/or directors of Lionheart, and participation in, and/or awareness of Lionheart's

operations, and/or intimate knowledge of the Proxy filed with the SEC, they had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of Lionheart with respect to the Proxy, including the content and dissemination of the various statements in the Proxy that are materially false and misleading, and the omission of material facts specified above.

187.    Each of the Director Defendants was provided with or had unlimited access to copies of the Proxy and other statements that were false and misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

188.    Each of the Director Defendants had direct and supervisory involvement in the negotiation of the Merger, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations alleged herein, and exercised the same. In particular, the Proxy at issue references the unanimous recommendation of the Board to approve the Merger, and recommends that Lionheart stockholders vote for the Merger. The Director Defendants were thus involved in the making of the Proxy.

189.    In addition, as the Proxy sets forth at length, the Director Defendants were involved in negotiating, reviewing, and approving the Merger. The Proxy purports to describe the various issues and information that the Director Defendants reviewed and considered in connection with such negotiation, review and approval.

190.    By virtue of the foregoing, the Director Defendants had the ability to exercise control over and did control a person or persons who violated Section 14(a), by their acts and omissions as alleged herein. By virtue of their positions as controlling persons, these Defendants are liable under Section 20(a) of the Exchange Act.

191.    Plaintiff and other Lionheart stockholders have no adequate remedy at law, and as a result of the Director Defendants' violations of Section 20(a) of the Exchange Act, are threatened with irreparable harm by virtue of being deprived of their entitlement to cast fully informed votes with respect to the Merger, as more fully explained above.

**COUNT V**

**Violations of Section 11 of the Securities Act Against The Section 11 Defendants**

192.    Plaintiff incorporates all the foregoing by reference.

193.    This Count is brought pursuant to § 11 of the Securities Act, 15 U.S.C. § 77k, against The Section 11 Defendants.

194.    The Registration Statement contained untrue statements of material facts, omitted other facts necessary to make the statements made not misleading, and omitted to state material facts required to be stated therein.

195.    The Section 11 Defendants are strictly liable to Plaintiff and the Class for the misstatements and omissions.

196.    None of the Section 11 Defendants named herein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration statement were true and without omissions of any material facts and were not misleading.

197.    By reason of the conduct herein alleged, each Section 11 Defendant violated or controlled a person who violated § 11 of the Securities Act.

198.    Plaintiff acquired the Company's securities pursuant to the Registration Statement.

199.    At the time of their purchases of Company securities, Plaintiff and other members of the Class were without knowledge of the facts concerning the wrongful conduct alleged herein and could not have reasonably discovered those facts prior to the disclosures herein.

200.    This claim is brought within one year after discovery of the untrue statements and/or omissions in the offering that should have been made and/or corrected through the exercise of reasonable diligence, and within three years of the effective date of the offering. It is therefore timely.

## COUNT VI

**Violations of Section 15 of the Securities Act Against the Section 11 Defendants**

201.    Plaintiff incorporates all the foregoing by reference.

202.    This cause of action is brought pursuant to § 15 of the Securities Act, 15 U.S.C. § 77o against the Section 11 Defendants.

203.    The Section 11 Defendants were controlling persons of MSP Recovery by virtue of their positions as directors and/or senior officers. The Section 11 Defendants each had a series of direct and indirect business and personal relationships with other directors and officers and major shareholders of MSP Recovery. MSP Recovery controlled the Individual Defendants and all of MSP Recovery's employees.

204.    MSP Recovery and the Section 11 Defendants were culpable participants in the violations of § 11 of the Securities Act as alleged above, based on their having signed or authorized the signing of the Registration Statement and having otherwise participated in the process which allowed the offering to be successfully completed.

## PRAYER FOR RELIEF

**WHEREFORE**, plaintiff, on behalf of himself and the Class, prays for judgment and relief as follows:

(a)    declaring this action to be a proper class action, designating plaintiff as Lead Plaintiff and certifying plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure and designating plaintiff's counsel as Lead Counsel;

(b)    awarding damages in favor of plaintiff and the other Class members against all defendants, jointly and severally, together with interest thereon;

awarding plaintiff and the Class reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)    awarding plaintiff and other members of the Class such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: August 23, 2023            **THE ROSEN LAW FIRM, P.A.**

/s/Laurence M. Rosen
Laurence M. Rosen, Esq.,
Fla. Bar No. 0182877
275 Madison Avenue, 40th Floor
New York, New York 10016
Telephone: (212) 686-1060
Fax: (212) 202-3827
Email: lrosen@rosenlegal.com